IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30645

_____

In The Matter of: LILJEBERG ENTERPRISES, INC.,

          Debtor,

--------------------

LIFEMARK HOSPITALS, INC.,

        Appellant - Cross-Appellee,

      versus

LILJEBERG ENTERPRISES, INC.,

        Appellee - Cross-Appellant,

_____

LILJEBERG ENTERPRISES, INC.,

        Appellee - Cross-Appellant,

      versus

LIFEMARK HOSPITALS, INC.,

        Appellant - Cross-Appellee,

_____

LIFEMARK HOSPITALS, INC.,

        Appellant - Cross-Appellee

      versus

ST. JUDE HOSPITAL OF KENNER, LOUISIANA, L.L.C.,

        Appellee - Cross-Appellant,

_____

LILJEBERG ENTERPRISES, INC.,

        Appellee - Cross-Appellant,

      versus

LIFEMARK HOSPITALS OF LOUISIANA, INC.;
LIFEMARK HOSPITALS, INC.;
AMERICAN MEDICAL INTERNATIONAL;
TENENT HEALTHCARE CORPORATION,

        Appellants - Cross-Appellees.

Appeals from the United States District Court

August 28, 2002

Before HIGGINBOTHAM, DeMOSS, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal brings to us three of four consolidated actions arising from a failed relationship formed to build and manage a hospital and medical office building in Kenner, Louisiana, the latest round in the parties' protracted litigation.

Following a bench trial of the consolidated cases, the district court overturned a judicial sale of the hospital, reinstated various contracts which defined the financing and lease of the hospital, and denied the holder of the hospital mortgage a claim for a deficiency judgment. The court also ruled that, under a Clinical Pharmacy Management Agreement governing the operation of the hospital pharmacy and the flow of drugs to the hospital, Liljeberg Enterprises, Inc., the hospital pharmacy operator and principal supplier of drugs to the hospital, was due almost $12.5 million and the hospital operators and principal purchasers of the drugs for the hospital were owed $741,879.

In Chapter 11 proceedings, the district court conditionally granted the debtor Liljeberg Enterprises, Inc.'s request to assume

the Clinical Pharmacy Management Agreement as an executory contract pursuant to 11 U.S.C. § 365.[1]

We reverse the district court's judgment setting aside the judicial foreclosure of the hospital and declining to award the deficiency due on the mortgage debt, we reverse the district court's order allowing the debtor in the Chapter 11 proceedings to assume the pharmacy agreement, and finally we affirm in part and reverse in part the various awards made under the pharmacy agreement.

I.

First, the dramatis personae.  The four consolidated actions involve Lifemark Hospitals of Louisiana, Inc., Lifemark Hospitals, Inc., American Medical International, and Tenet Healthcare Corporation on one side,[2] and Liljeberg Enterprises, Inc. ("Liljeberg Enterprises") and St. Jude Hospital of Kenner, La., L.L.C. ("St. Jude") (collectively the "Liljebergs") on the other.

Liljeberg Enterprises is a corporation whose sole shareholders are John Liljeberg and his brother Robert Liljeberg, both licensed pharmacists.  The Liljebergs, through Liljeberg Enterprises, formed

---

[1]  Neither party appeals from the district court's judgment in Cause No. 95-2922, denying Liljeberg Enterprises, Inc.'s request for injunctive relief. The district court consolidated Cause No. 93-1794 early on with Cause Nos. 93-4249, 94-3993, and 95-2922 for all purposes, but, for ease of reference, we follow the district court and the parties in referring to the various parts of the district court's judgment in the case by the original causes of action numbers.

[2]  We refer to these parties collectively or individually as "Lifemark" except where further distinction is relevant.

3

a series of corporations and a partnership to own or operate a medical complex consisting of a hospital, a hospital pharmacy, and a medical office building. St. Jude, a wholly-owned subsidiary of Liljeberg Enterprises, owned the St. Jude Hospital ("hospital"), which is now known as Kenner Regional Medical Center. St. Jude Medical Office Building, Ltd. Partnership ("St. Jude Limited Partnership"), of which St. Jude was the general partner, owned the adjacent medical office building. Funding for that building came from Travelers Insurance Company, a loan of $25 million on October 10, 1985, secured by a mortgage on the medical office building and an assignment to Travelers of rents to be paid on leased spaces in the building.

Lifemark Hospitals, Inc. was a national hospital management company that provided financing to St. Jude to build the hospital. Lifemark Hospitals of Louisiana, Inc., a wholly owned subsidiary of Lifemark Hospitals, Inc., entered into an agreement with St. Jude to lease and operate the hospital. American Medical acquired Lifemark Hospitals, Inc. in 1984, and Tenet became the successor to American Medical in 1995.

II.

On August 26, 1981, the Liljebergs obtained a "certificate of need" under Section 1122 of the Social Security Act to build and operate a 300-bed acute care facility in the New Orleans area.[3]

---

[3] The 1122 certificate allowed certain capital costs to be passed through to the government.

4

This Section 1122 certificate was the only one available in the New Orleans area and the last one to be granted in Louisiana. Lacking the money to build a hospital, the Liljebergs immediately solicited participation by many companies, including Health Services Acquisition Corporation. The Liljebergs' negotiations with Health Services extended over several months before disintegrating into heated litigation.[4] The Liljebergs began their discussions with Lifemark in the latter part of 1981, under the shadow of the approaching deadline under the Section 1122 certificate of need.

In their negotiations with Lifemark, John Liljeberg was assisted by a team of two attorneys, one of whom was a CPA, an economist, and two pharmacy consultants. John Liljeberg insisted from the outset that, as part of any deal, the Liljebergs had to be given a contract to provide pharmaceutical services to the hospital. On December 21, 1982, the parties signed a letter of intent setting forth the principal terms of their agreement.

The final documents were executed in early 1983, including: (1) a loan agreement, wherein Lifemark Hospitals, Inc. agreed to provide financing of over $44 million to St. Jude for construction of the hospital; (2) a promissory note signed by St. Jude and made payable to Lifemark Hospitals, Inc.; (3) a collateral mortgage, a collateral mortgage note, and a pledge of the collateral mortgage note, all signed by St. Jude to secure the note to Lifemark

---

[4] *See, e.g.*, *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988).

5

Hospitals, Inc.; (4) a lease agreement wherein Lifemark Hospitals of Louisiana, Inc. agreed to lease and operate the hospital from St. Jude; and (5) the Clinical Pharmacy Management Agreement ("pharmacy agreement"), signed by Liljeberg Enterprises and Lifemark Hospitals of Louisiana, Inc., wherein Liljeberg Enterprises agreed to provide pharmaceutical services to the hospital. Additionally, the Liljebergs received a cash payment of $2.5 million as called for by the letter of intent.

These agreements were intertwined in at least two ways: (1) St. Jude's note payments and Lifemark's lease payments were offsetting transactions so that their monthly payment was only a bookkeeping entry;[5] and (2) the pharmacy agreement contained a cross-default provision.

A dispute arose between Lifemark and St. Jude over the financing and project management involved in the construction of the hospital. That dispute was settled by written agreement in 1991 after arbitration. As part of the settlement, St. Jude executed a renewal note, renewing and extending the original note. Like the original note, the renewal note was secured by the original collateral mortgage, collateral mortgage note, and pledge of collateral mortgage note. To further secure the renewal note, St. Jude executed a "Collateral Assignment of Basic Rent"

---

[5] Under both its original note and a later renewal note, St. Jude had the right to offset its right to receive basic rent against St. Jude's note obligations. St. Jude exercised this option at all relevant times through October 1, 1994.

6

("collateral assignment of rents"), which was recorded, providing Lifemark Hospitals, Inc. a secured interest in rents in the event of a future default by St. Jude.

The hospital, hospital pharmacy, and medical office building became operational in 1985. By March of 1990, St. Jude Limited Partnership had defaulted on its Travelers loan and, in June 1990, Travelers sued St. Jude Limited Partnership and other defendants. The suit, seeking seizure and sale by judicial process of the medical office building, was successful, and the building was sold at public auction on October 18, 1991 to Travelers, the sole bidder.

More protracted litigation ensued, in the course of which a panel of this court commented that the conduct of the Liljebergs constituted "as egregious and unconscionable of bad faith contractual dealings as the members of this panel can recall having encountered."[6] Travelers obtained an amended judgment in December 1992 awarding Travelers both unpaid rents and damages from St. Jude Limited Partnership based on, *inter alia*, a jury verdict finding waste committed by the Liljebergs with respect to the collateral in the medical office building securing the repayment of Travelers's loan to St. Jude Limited Partnership for the construction of the building. When efforts to collect the amended judgment against the partnership failed, Travelers filed a separate action against St.

---

[6] *Travelers Ins. Co. v. St. Jude Hosp.*, No. 92-9579, 21 F.3d 1107, at 2 (5th Cir. Apr. 20, 1994) (unpublished per curiam).

7

Jude, the general partner of St. Jude Limited Partnership, in which Travelers obtained a summary judgment on July 30, 1993, which this Court affirmed.[7]

On August 12, 1993, Travelers secured a lien on the hospital by filing its $7.8 million judgment against St. Jude. The Travelers lien primed Lifemark's collateral mortgage because Lifemark had not at that time reinscribed its lien.[8] Lifemark reinscribed its collateral mortgage on June 29, 1994.

Within the same time frame, on January 27, 1993, within one month after Travelers obtained its $7.8 million judgment, Liljeberg Enterprises filed for bankruptcy protection. In the course of these bankruptcy proceedings, Liljeberg Enterprises as the debtor in possession, sought the federal district court's permission to assume, that is, continue to operate under, the pharmacy agreement, pursuant to 11 U.S.C. §§ 365 and 1107. Shortly thereafter, on August 11, 1993, within one month after Travelers sought to collect its judgment against St. Jude, St. Jude filed for Chapter 11 bankruptcy protection. The bankruptcy court dismissed that action one year later, finding that St. Jude had filed in bad faith.

---

[7] *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, 37 F.3d 193 (5th Cir. 1994).

[8] Lifemark's collateral mortgage is dated March 15, 1983. In order to preserve the rank of the collateral mortgage, it had to be reinscribed by March 15, 1993. *See* LA. CIVIL CODE art. 3328; *accord id.* art. 3369 (repealed by 1992 La. Acts 1132). Nearly five months later Travelers filed its judgment lien. One effect of Lifemark's failure to reinscribe was that it was not able to foreclose on the hospital following the filing of the Travelers lien without paying the Travelers debt. Lifemark, in fact, ultimately sued its former attorneys for legal malpractice on the basis of this failure to reinscribe.

On August 30, 1994, Travelers began the process of foreclosing on the hospital.  Once again, St. Jude asked the district court to vacate Travelers's writ of execution and to find Travelers's lien inferior to Lifemark's lien.  At St. Jude's request, Lifemark filed a memorandum setting forth the facts concerning the ranking of the liens.  The court denied St. Jude's motions and allowed the foreclosure sale to proceed.

Prior to the sale, Lifemark Hospitals, Inc. filed a motion in the federal district court before Judge Henry A. Mentz, Jr. seeking permission to bid credits against the value of its collateral mortgage instead of cash at the judicial sale, subject to any obligation to pay the amount of cash necessary to satisfy the superior judicial mortgage of Travelers.  The court granted Lifemark Hospitals, Inc.'s motion.

The United States Marshal's seizure and judicial sale of the hospital occurred on October 28, 1994.  Lifemark Hospitals of Louisiana, Inc. was the sole bidder and purchased the hospital for $26 million, or two-thirds of the $37.5 million appraised value as the minimum price prescribed by Louisiana statute.  The purchase price was distributed as follows: (1) $7,786,083.33 went to Travelers to satisfy its lien; (2) $18,165,483.74 went to Lifemark Hospitals, Inc. to reduce the deficiency owed on St. Jude's note to Lifemark Hospitals, Inc.; and (3) the balance was applied to costs of the sale.  The district court subsequently confirmed the sale. St. Jude appealed the orders of the district court, and this court

9

affirmed, dismissing as moot St. Jude's challenge to the confirmed judicial sale.[9]

As a result, Lifemark became the owner of the hospital, and Lifemark's lease with St. Jude was extinguished as a matter of law under the doctrine of confusion. At the same time, Lifemark accelerated the debt owed by St. Jude under the renewal note, and Lifemark sought to terminate the pharmacy agreement based upon the cross-default provision in that agreement.

## III.

Ultimately four lawsuits were consolidated and tried to the bench in the United States District Court for the Eastern District of Louisiana in June and July 1997. The district court entered findings of fact and conclusions of law and a partial judgment on April 26, 2000, later amending the judgment by adding a certification under Federal Rule of Civil Procedure 54(b) on August 1, 2000, three years after the case was tried. The amended judgment included a Rule 54(b) certification for immediate appeal of "all claims other than Liljeberg Enterprises, Inc.'s claim in Cause No. 93-4249 for damages accruing from the commencement date of the trial and continuing through the date of" the amended judgment.

---

[9] *See Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, Nos. 94-30636, 94-30639 & 94-30665, 56 F.3d 1386 (5th Cir. May 24, 1995) (unpublished per curiam).

10

In the first lawsuit, Cause No. 94-3993, Lifemark sued St. Jude to collect the unpaid balance of a promissory note evidencing the debt incurred in building the hospital. St. Jude counterclaimed for damages asserting a variety of lender liability claims. The district court awarded no damages to Lifemark or St. Jude. Rather it set out to undo the transaction and overturned the 1994 confirmed judicial sale of the hospital. This upset was made contingent upon either St. Jude or its parent company Liljeberg Enterprises reimbursing Lifemark the amount that Lifemark had paid to Travelers, the holder of the superior lien and judicial mortgage. The district court also reinstated all of the related commercial instruments as if the judicial sale had never taken place and denied Lifemark's deficiency claim.

In the second suit, Cause No. 93-1794, Liljeberg Enterprises, as the Chapter 11 debtor in possession, sought permission from the bankruptcy court to assume the pharmacy agreement between Lifemark and Liljeberg Enterprises as an executory contract pursuant to Bankruptcy Code section 365. On October 19, 1993, the district court withdrew the reference to bankruptcy court of LEI's motion to assume. The district court, over Lifemark's objection, granted the motion to assume the pharmacy contract.

The third suit, Cause No. 93-4249, was filed in Louisiana state court but removed to the federal district court. Here Liljeberg Enterprises claims that Lifemark, acting in bad faith, breached and wrongfully "circumvented" the pharmacy agreement.

11

Lifemark denied the allegations and counterclaimed for overcharges and breaches of the pharmacy agreement.[10] The district court found that Lifemark owed Liljeberg Enterprises $12,432,905.92 for breach of payment due under the pharmacy agreement and that Liljeberg Enterprises owed Lifemark $741,879 in overcharges.

Finally, in the fourth suit, Cause No. 95-2922, Liljeberg Enterprises sought an injunction to prohibit Lifemark from unlawfully dispensing legend drugs at the hospital.[11] The district court denied Liljeberg Enterprises's request.

IV.

Lifemark here attacks judgments in Cause Nos. 94-3993, 93-1794, and 93-4249 on many grounds. In Cause No. 94-3993, Lifemark argues that the district court erred by rescinding the judicial sale of the hospital when this court of appeals decided in prior

---

[10] Lifemark filed many of its breach of contract claims as part of its counterclaim in the bankruptcy cause of action, Cause No. 93-1794. The district court consolidated Cause No. 93-1794 with Cause No. 93-4249 early in the course of this litigation, and, as a result, like the district court's opinion and judgment, this court's opinion treats Lifemark's claims related to LEI's breach of the pharmacy agreement as though they were filed in Cause No. 93-4249.

[11] Legend drugs are prescription drugs that bear a legend on the label warning that the drug may not be dispensed without a prescription from a duly-authorized practitioner. *See* LA. REV. STAT. § 37:1164(45) ("'Prescription drug' or 'legend drug' means a drug that is required by any applicable federal or state law or regulation to be dispensed or delivered pursuant only to a prescription drug order, or is restricted to use by practitioners only."); *id.* § 40:1237(3) ("'Legend drug' means any drug or drug product bearing on the label of the manufacturer or distributor, as required by the Federal Food and Drug Administration, the statement 'Caution: Federal law prohibits dispensing without prescription.'"); LA. ADMIN. CODE tit. 46, pt. LIII, § 3501(A) ("Legend Drugs. A legend drug is a medication which must only be dispensed by a pharmacist on the order of a licensed practitioner and shall bear the following notation on the label of a commercial container: 'caution: federal law prohibits dispensing without a prescription' (Ref. R.S. 40:1237, et seq. [1982] and U.S.C. 21:353(b) [1987]).")

12

litigation that St. Jude's challenge to the judicially confirmed sale was moot; that the judgments are flawed by the following erroneous rulings: that Lifemark Hospitals, Inc. had a duty to St. Jude to reinscribe the collateral mortgage, and that Lifemark Hospitals, Inc. had a duty to terminate the Travelers foreclosure; that Lifemark Hospitals, Inc. had a duty to prevent Lifemark Hospitals of Louisiana, Inc. from purchasing the hospital at the foreclosure sale; that Lifemark acted in bad faith or colluded to chill the bidding at the foreclosure sale which proximately caused St. Jude's loss; and that Lifemark Hospitals of Louisiana, Inc. did not properly purchase the hospital at two-thirds of its appraised value. Lifemark also argues that the district court erred in concluding that Lifemark is not entitled to recover on its deficiency claim under the renewal promissory note.

In Cause No. 93-1794, Lifemark argues that the district court erred in allowing Liljeberg Enterprises to assume the pharmacy agreement on several grounds. First, it erred in its ruling that the pharmacy agreement did not terminate by its own terms prior to the district court's order allowing assumption. Second, by failing to properly interpret sections 5.1(e) and 5.1(b) of the pharmacy agreement and section 11.1 of the lease and the fourth and fifth covenants of the mortgage.

In Cause No. 93-4249, Lifemark argues that the district court erred in its interpretation of sections 2.4, 2.6, 4.1, and Exhibit B of the pharmacy agreement and in denying Lifemark's motion to

13

reopen the evidence. Further, Lifemark argues that the district court erred: in awarding damages based upon a procedurally flawed audit; in awarding duplicative damages; in allowing Liljeberg Enterprises to recover costs greater than those allowed by the hospital's prime vendor contract under section 2.4 of the pharmacy agreement; in allowing Liljeberg Enterprises to recover based on unexplained bills; in failing to award damages to Lifemark for Liljeberg Enterprises's overbilling; and in its interpretation of the parties' stipulation as to actual acquisition costs payable under an earlier state court judgment.

Finally, Lifemark argues that the district court erred in awarding any relief against Tenet, a non-party.

On its cross-appeal, in Cause No. 94-3993, Liljeberg Enterprises argues that the district court erred in requiring St. Jude and Liljeberg Enterprises to reimburse Lifemark the $7,834,516.26 it paid to Travelers for the allegedly collusive purchase of the hospital. The Liljebergs also contend on their cross-appeal in Cause Nos. 94-3993, 93-1794, and 93-4249 that Liljeberg Enterprises and St. Jude are entitled to attorneys' fees by the parties' lease agreement and under Louisiana Civil Code articles 1997 and 1958.

## V. Cause No. 94-3993

The district court in Cause No. 94-3993 overturned the confirmed 1994 judicial sale of the hospital contingent upon either St. Jude or Liljeberg Enterprises reimbursing Lifemark the

14

approximately $7.8 million that Lifemark paid to Travelers to purchase the hospital at foreclosure. The district court also reinstated the renewal promissory note, collateral mortgage note, pledge of collateral mortgage note, collateral mortgage, hospital lease, and collateral assignment of rents which existed before the judicial sale and held that all rental payments that were due by Lifemark to St. Jude under the lease shall be deemed paid by St. Jude to Lifemark and the renewal promissory note, collateral mortgage note, pledge of collateral mortgage note, and collateral mortgage are deemed current and not in default as of the date of judgment. Finally, the district court denied Lifemark's claim for a deficiency pursuant to the renewal promissory note.

We review *de novo* the district court's legal conclusions, but review its findings of fact for clear error.[12] We have explained that "'a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed,'" and that, "despite an appellate court's conviction that it would have weighed the evidence differently had it been sitting as the trier of fact, it may not reverse a district court's findings when they are based on a plausible account of the

---

[12] *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000).

15

evidence considered against the entirety of the record."[13] Accordingly, "when 'two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly erroneous.'"[14] Further, "as to mixed questions of law and fact, we review the district court's fact findings for clear error, and its legal conclusions and application of law to fact *de novo*."[15]

## A.

The district court premised its decision setting aside the judicial sale of the hospital on a finding that Lifemark breached fiduciary duties and an obligation of good faith owed to St. Jude. It found these obligations in the Louisiana law of pledge. The district court found that Lifemark Hospitals, Inc. became the pledgee of St. Jude by holding the collateral mortgage note and the right to basic rent under the collateral assignment of rents. As pledgee, Lifemark owed fiduciary duties to St. Jude, its pledgor, to protect that collateral, the collateral mortgage note and the right to basic rent under the collateral assignment of rents.

The found breach came when Lifemark failed to timely reinscribe the collateral mortgage and "allowed" Travelers' judgment mortgage to prime the collateral mortgage. The district court also found a breach of a duty to preserve the lease covering

---

[13]  *NAACP v. Fordice*, 252 F.3d 361, 365 (5th Cir. 2001) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)).

[14]  *Id.* (quoting *Anderson*, 470 U.S. at 573).

[15]  *Payne v. United States*, 289 F.3d 377, 381 (5th Cir. 2002).

16

the assigned rents as pledgee of the right to basic rent under the collateral assignment of rents. This breach came, it found, when Lifemark Hospitals, Inc. allowed Lifemark Hospitals of Louisiana, Inc. to acquire the hospital. That acquisition extinguished the lease under the doctrine of confusion pursuant to Louisiana Civil Code article 1903 as well as the rental stream assigned to Lifemark Hospitals, Inc.

As the district court explained it, when St. Jude became liable to Travelers for over $7.8 million, specifically $7,834,516.26, and the hospital became subject to Travelers's approximately $7.8 million lien, Lifemark Hospitals, Inc. was obligated to buy out the Travelers lien, to add the Travelers debt to the debt owed by St. Jude to Lifemark Hospitals, Inc. Relatedly, it found an obligation to refrain from having Lifemark Hospitals of Louisiana, Inc. purchase the hospital at the foreclosure sale. All these were found to be duties, all of which Lifemark breached.

In this diversity case, we are controlled by the substantive law of Louisiana. We are to determine and apply its law as we believe the Supreme Court of Louisiana would, looking to the decisions of intermediate Louisiana appellate courts for guidance where the Supreme Court of Louisiana has not spoken clearly to the issue.[16]

---

[16] *See Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 252 (5th Cir. 2001); *Hulin v. Fibreboard Corp.*, 178 F.3d 316, 328 (5th Cir. 1999).

We conclude that the foundational principles of the entire set of the district court's rulings are deeply flawed. Such duties are not to be found in Louisiana law.

There is no question but that, under Louisiana law, "'a trust relationship between the pledgor and pledgee'" carries with it "'attendant duties to protect the debt or the obligation and the collateral.'"[17] But holding the collateral mortgage note and the right to basic rent under the collateral assignment of rents did not create a pledgor-pledgee relationship giving rise to the duties discovered by the district court.

To understand why this is so it is helpful to review the Louisiana law of pledge and collateral mortgages. "The pledge is a contract by which one debtor gives something to his creditor as a security for his debt."[18] The Supreme Court of Louisiana has very recently repeated the Louisiana law of pledge:

> Pledge is an accessory contract by which one debtor gives something to a creditor as security for the debt. Invariably, the thing given as security for the debt is a movable, in which case the contract is more accurately called pawn. A person may give a pledge not only for his own debt, but also for that of another. The pledge secures only that debt or debts contemplated in the contract between the pledgor and pledgee.[19]

---

[17] *Trans-Global Alloy Ltd. v. First Nat'l Bank of Jefferson Parish*, 583 So.2d 443, 453 (La. 1991) (quoting *In re Pan American Life Ins. Co.*, 88 So.2d 410, 415 (La. App. 2 Cir. 1956)).

[18] LA. CIV. CODE art. 3133.

[19] *Diamond Servs. Corp. v. Benoit*, 780 So.2d 367, 371 (La. 2001) (citations and footnote omitted).

18

A "collateral mortgage" is statutorily defined as "a mortgage that is given to secure a written obligation, such as a collateral mortgage note, negotiable or nonnegotiable instrument, or other written evidence of debt, that is issued, pledged, or otherwise used as security for another obligation."[20] We recently summarized the basic operation of a typical collateral mortgage transaction under Louisiana law:

> In a typical Louisiana collateral mortgage transaction, the borrower contemporaneously executes a promissory note (known as a collateral mortgage note) and an act of mortgage (known as a collateral mortgage). In this latter instrument, the mortgagor acknowledges his indebtedness and states his intent to pledge the collateral mortgage note, which is secured by the collateral mortgage, as security for the advancement of funds. The collateral mortgage note is customly made payable on demand, to "Bearer" or "Myself" or "Any Future Holder," and is "paraphed" for identification with the mortgage. This collateral mortgage package is then delivered by the borrower in pledge to the lender to secure an indebtedness which is usually represented by a separate "hand note."
> The pledge of a collateral mortgage note and collateral mortgage to secure a debt is a contract. The pledge secures only the debt or debts contemplated in the act of pledge between the pledgor and the pledgee. A collateral mortgage package may be pledged to secure particular debts, either previously existing or contracted contemporaneously with the pledge, or future loans by the pledgee to the pledgor—or both—up to the limits of the pledge.[21]

---

[20] LA. REV. STAT. § 9:5550(1).

[21] *Charrier v. Sec. Nat'l of Or. (In re Charrier)*, 167 F.3d 229, 232–33 (5th Cir. 1999) (footnotes omitted). We have also discussed the usual purpose to which collateral mortgages are put: "The collateral mortgage is commonly used with financing in which the maker draws the loan proceeds in stages. The collateral note and mortgage are made for the full amount of the line of credit extended by the lender. This is then pledged as security for a debt, usually represented by a separate hand note. This seemingly fictitious transaction is a Louisiana credit device that lenders use to obtain a lien on property effective

The Supreme Court of Louisiana has made clear that "[t]he collateral mortgage, though now recognized by statute, is a form of conventional mortgage that was developed by Louisiana's practicing lawyers and has long been recognized by Louisiana courts."[22] It "arose out of the need for a special form of mortgage to secure revolving lines of credit and multiple present and future cross-collateralized debts for which there was no provision in the Civil Code."[23]

More specifically, the Supreme Court of Louisiana explained:

> "A mortgage is an accessory right which is granted to the creditor over the property of another as security for the debt. La. Civ. Code arts. 3278, 3284. Mortgages are of three types: conventional, legal and judicial. La. Civ. Code art. 3286. Within the area of conventional mortgages, three different forms of mortgages are recognized by the Louisiana statutes and jurisprudence: an "ordinary mortgage" (La. Civ. Code arts. 3278, 3290); a mortgage to secure future advances (La. Civ. Code arts. 3292, 3293); and a collateral mortgage. *See Thrift Funds Canal, Inc. v. Foy,* 261 La. 573, 260 So.2d 628 (1972). Unlike the other two forms of conventional mortgages, a collateral mortgage is not a 'pure' mortgage; rather, it is the result of judicial recognition that one can pledge a note secured by a mortgage and use this pledge to secure yet another debt.
> "A collateral mortgage indirectly secures a debt via a pledge. A collateral mortgage consists of at least three documents, and takes several steps to complete. First, there is a promissory note, usually called a collateral mortgage note or a 'ne varietur' note. The collateral mortgage note is secured by a mortgage, the

---

on the date the mortgage is executed for advances not yet made, but which the lender may make in the future." *Fed. Sav. & Loan Ins. Corp. v. Murray*, 853 F.2d 1251, 1255 n.1 (5th Cir. 1988).

[22] *Diamond Servs.*, 780 So.2d at 370 (footnote omitted).

[23] *Id.* at 371.

so-called collateral mortgage. The mortgage provides the creditor with security in the enforcement of the collateral mortgage note.

"Up to this point, a collateral mortgage appears to be identical to both a mortgage to secure future advances and an ordinary mortgage. But a distinction arises in the collateral mortgage situation because money is not directly advanced on the note that is paraphed for identification with the act of mortgage. Rather, the collateral mortgage note and the mortgage which secures it are *pledged* to secure a debt."[24]

As such, "[b]ecause the mortgagor, after executing the collateral mortgage and the collateral mortgage note, then pledges the collateral mortgage note as security for a debt, usually represented by a separate hand note, the collateral mortgage package combines the security devices of pledge and mortgage."[25]

Synthesizing the law of pledge and on collateral mortgages, the Supreme Court of Louisiana has observed that a "[p]ledge is an accessory contract which secures the performance of an *existing* principal obligation," and "[t]he principal obligation in the collateral mortgage scheme is the actual indebtedness, usually represented by a hand note, and the collateral mortgage note is pledged to secure payment of the principal obligation."[26] The district court and Liljeberg Enterprises make much of the fact that the collateral mortgage "package" involves a "pledge," but, under the facts of this case, this is word play.

---

[24] *Id.* at 371 (quoting *First Guar. Bank v. Alford,* 366 So.2d 1299, 1302 (La. 1978)).

[25] *Id.* at 372 (footnote omitted).

[26] *Tex. Bank of Beaumont v. Bozorg,* 457 So.2d 667, 671 n.4 (La. 1984).

21

A collateral mortgage often involves a hand note that is a third party's note made payable to the mortgagor, which note is pledged by the mortgagor to the mortgagee.[27]  In such an instance, a pledgor-pledgee relationship with attendant duties—including a statutory duty of reasonable care and fiduciary duties—to protect the rights of the mortgagor in the third party's note against other creditors of the third party may well arise under statute by the virtue of the nature of the pledgor-pledgee relationship.[28]

Here, however, St. Jude executed a collateral mortgage on the hospital site and pledged a collateral mortgage note to Lifemark Hospitals, Inc. to secure the collateral mortgage, which was itself created to secure the promissory note evidencing Lifemark Hospitals, Inc.'s loan to St. Jude for construction of the

---

[27]  *See, e.g.*, *Diamond Servs.*, 780 So.2d at 372 ("The dispute in this case centers around the obligation that arises from the making of the collateral mortgage note when that note is pledged to secure the debt of a third party represented by a hand note executed by that third party.").

[28]  *See, e.g.*, LA. REV. STAT. § 10:9-207(a) ("Duty of care when secured party in possession.  Except as otherwise provided in subsection (d), a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession.  In the case of chattel paper or an instrument, reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed."); LA. CIV. CODE art. 3167 ("The creditor is answerable agreeably to the rules which have been established under the title: Of Conventional Obligations, for the loss or decay of the pledge which may happen through his fault."); *accord* LA. REV. STAT. § 10:9-207(1) ("A secured party must use reasonable care in the custody and preservation of collateral in his possession.  In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.") (superseded by 2001 La. Acts 128); *cf. Trans-Global*, 583 So.2d at 453 (holding that, in a case not involving a collateral mortgage, the duty of care imposed on a creditor, as the pledgee of a debtor's letter of credit from a third party, was that of prudent administrator such that the creditor could be held liable for the loss or decay of the pledge occurring through its fault).

hospital.  There was no third-party obligation involved.[29]  In such

a case, where the mortgagor has "pledged" to the mortgagee the

mortgagor's own hand note on which the mortgagor is directly

obligated to the mortgagee, the mortgagee has a duty to keep the

note so that it may be returned to the mortgagor upon payment of

[29]  Liljeberg Enterprises argues for first time in its reply brief that Lifemark did not raise in the district court its argument distinguishing between collateral mortgages involving third party notes and those involving hand notes on which the collateral mortgagor is the obligor.  Ordinarily, we do not consider arguments raised for the first time in a reply brief.  *See Price v. Roark*, 256 F.3d 364, 368 n.2 (5th Cir. 2001).  However, St. Jude's argument here seeks simply to invoke a rule which we at times invoke *sua sponte*: that arguments not raised in the district court cannot be asserted for the first time on appeal.  *See Stokes v. Emerson Elec. Co.*, 217 F.3d 353, 358 n.19 (5th Cir. 2000); *Brown v. Ames*, 201 F.3d 654, 663 (5th Cir.), *cert. denied*, 531 U.S. 925 (2000).  However, an argument is not waived on appeal if the argument on the issue before the district court was sufficient to permit the district court to rule on it.  *Brown*, 201 F.3d at 663; *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d 933, 943 n.8 (5th Cir. 1999); *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 141 n.4 (5th Cir. 1996).  That is the case here, based on our review of the record.  On appeal, Lifemark has certainly refined its argument to distinguish the duties owed by a collateral mortgagee/pledgee in third-party note situations as developed in the case law cited by St. Jude from Lifemark's situation, but Lifemark did sufficiently put before the district court its argument that no duty to reinscribe the collateral mortgage or to prevent the loss of the hospital flowed from its pledgor-pledgee relationship with St. Jude.  *See* R. 9076, 9151-57.  This was sufficient to permit the district court to rule on the essential argument Lifemark advances on appeal.

the underlying debt to the mortgagee.[30]  It is true that the Supreme

Court of Louisiana has cited Professor Slovenko's observation that:

> ... [I]n the case of promissory notes, bills of exchange,
> and other evidences of indebtedness pledged as security,
> a duty exists on the part of the pledgee to preserve the
> rights of the pledgor against the obligors in the
> deposited documents.  The pledgee is held responsible if
> he neglects to have a promissory note, the subject of the
> pledge, protested for non-payment, and the endorser is
> discharged in consequence; or, if he neglects to have a
> mortgage which is pledged to him reinscribed or
> reregistered in proper time, and it loses its rank and
> effect.[31]

It is also the case that Professor Slovenko's discussion assumes

that a third-party obligation is involved with the pledge, where

here it is not.  To the contrary, the obligor of the underlying

document and the pledgor (and the collateral mortgagor) were one

and the same—St. Jude.

Lifemark Hospitals, Inc. loaned money to St. Jude to build a

hospital, a loan evidenced by a loan agreement and a promissory

---

[30]  *Cf.* Max Nathan, Jr. & Anthony P. Dunbar, *The Collateral Mortgage: Logic and Experience*, 49 LA. L. REV. 39, 49 (1988) ("Since a collateral mortgage may be used to secure a specific debt, a debtor who wishes to limit the mortgage to that debt can lawfully do so and the pledge agreement is clearly the proper document in which to manifest such an intent.  The risk, of course, is that the ne varietur note, which is negotiable, *may fall into the hands of bona fide third parties* who are unaware of the pledge agreement and are not bound by it.  That risk is probably the major drawback to use of the collateral mortgage.  *The problem is mitigated by the fact that a pledgee, who accepts a fiduciary duty as such, surely would be liable to a borrower injured in such a situation.*  The risk can be further minimized by use of a third-party custodian to hold the ne varietur note, or by use of a safety deposit box with appropriate restrictions." (emphasis added; footnotes omitted)); *cf. also People's Bank v. Cookston*, 142 So. 285, 286 (La. App. 2 Cir. 1932) (holding that the plaintiff, as pledgee of the chattel mortgage note, was "under obligation to keep the pledged property intact, in order that it might be returned when the principal obligation is paid, when it does not proceed on the pledged property").

[31]  Ralph Slovenko, *Of Pledge*, 33 TUL. L. REV. 59, 121 (1958) (cited in *Trans-Global*, 583 So.2d at 453).

note, or hand note, in turn collateralized by the pledge of a collateral mortgage note, itself secured by a collateral mortgage on the hospital site.[32]  The extraordinary duty the district court imposed upon Lifemark, who loaned the money to build the hospital and held the mortgage on it to secure its payment, is inexplicable. Whatever duty Lifemark may have owed as the pledgee of the collateral mortgage note, they do not include a requirement that Lifemark reinscribe the mortgage executed in Lifemark's favor to secure a debt owed by St. Jude to Lifemark, in order that the mortgage may retain priority for Lifemark's benefit as pledgee and mortgagee.  As Lifemark aptly points out, ordinarily a debtor such as St. Jude is happy to have its creditor fail to record its lien. We reject the assertion that Lifemark as the mortgagee here owed a duty to its mortgagor to reinscribe the mortgage, as illustrated in part, indeed, by the very difficulty of describing exactly how not protecting a mortgage's first position, in and of itself, could possibly harm the *mortgagor.*

Nor can this theory explain how it can lie beside the undisputed right of Lifemark Hospitals, Inc. to, "at any time, without notice to anyone, release any part of the Property from the effect of the Mortgage."  This right of release is explicitly

_____

[32]  Under a later settlement in 1991, St. Jude executed a renewal note, renewing and extending the original note, and, like the original note, the renewal note was secured by the original collateral mortgage, collateral mortgage note, and pledge of the collateral mortgage note.  Along with the execution of the renewal note, St. Jude provided Lifemark Hospitals, Inc. with additional security in the form of a collateral assignment of rents, which assignment was recorded.

25

recited in the collateral mortgage itself.  In addition, the renewal note provides that St. Jude "agree[s] to any ... release of any [of the security herefor]."  The right of Lifemark to unilaterally release any part of the property from the mortgage is wholly at odds with the district court's discovery of a "duty" to reinscribe the collateral mortgage.  It was Lifemark's contracted-for right to retain the collateral mortgage's priority against other creditors, under both the renewal note and the collateral mortgage itself.[33]  The grant of a security interest to secure St. Jude's debt was to protect the lender, Lifemark Hospitals, Inc., not the borrower.

Nor did Lifemark as mortgagee have a duty to protect the hospital owner from other creditors asserting their rights against the hospital, as the district court held Lifemark did.  It is self-evident that there is a vast difference between a statutory duty to prevent loss or decay of a third party's note evidencing a debt owed to the collateral mortgagor/pledgor in order to preserve against other third parties the collateral mortgagor's rights in the third party's note pledged by it to the collateral mortgagee, and a supposed fiduciary duty on the part of the collateral mortgagee to protect the collateral mortgagor against a third

---

[33] *Cf. Commercial Nat'l Bank in Shreveport v. Audubon Meadow P'ship*, 566 So.2d 1136, 1140-41 (La. App. 2 Cir. 1990) (holding that, in light of the guaranty agreement's permitting the lending bank to surrender any securities without notice or consent from the guarantor, the bank's alleged negligence in allowing a letter of credit to lapse provided the guarantor with no basis for recovery against the bank).

26

party's exercise of its rights in an entirely different instrument or judgment. This is a mere chimera, existing nowhere in Louisiana law. It was apparently constructed out of whole cloth.

In sum, Lifemark had no duty to timely reinscribe the collateral mortgage, and the district court erred as a matter of law in concluding that Lifemark had a consequential duty to "mitigate" any harm allegedly caused by Lifemark's failure to reinscribe by buying out the Travelers lien and adding the Travelers debt to the debt owed by St. Jude to Lifemark.

As for any duties arising out of Lifemark's holding the right to basic rent under the collateral assignment of rents, Lifemark argues in part that the statutory duty of reasonable care under Louisiana Civil Code article 3167 does not apply to an assignment of rents because such an assignment is not a pledge where Lifemark did not take possession of a corporeal movable or evidence of a credit, such as a note, as required by Louisiana Civil Code article 3152.[34] Lifemark argues that article 3167 imposes only custodial duties on pledgees and that no such duties attend its collateral assignment of rents from St. Jude.

This argument, however, does not account for Louisiana Civil Code article 3153, which provides: "But this delivery is only necessary with respect to corporeal things; as to incorporeal

_____

[34] *See* LA. CIV. CODE art. 3152 ("It is essential to the contract of pledge that the creditor be put in possession of the thing given to him in pledge, and consequently that actual delivery of it be made to him, unless he has possession of it already by some other right.").

27

rights, such as credits, which are given in pledge, the delivery is merely fictitious and symbolical."[35] An assignment of rents may be a pledge, because "[o]ne may, in fine, pawn incorporeal movables, such as credits and other claims of that nature."[36] Indeed, Louisiana statutes provide that "[c]laims, credits, obligations, and incorporeal rights in general not evidenced by written instrument or muniment of title, shall be subject to pledge, and may be pledged in the same manner as other property" and that "[t]he pledge shall be valid as to all persons without delivery of the claim, credit, obligation, or incorporeal right to the pledgee."[37]

But again, that is beside the point, the duty attributed by the district court to Lifemark as pledgee of the right to basic rent under the collateral assignment of rents did not exist. The recorded collateral assignment of rents simply gave Lifemark a secured right to rents upon default by St. Jude under the renewal

---

[35] *Id.* art. 3153.

[36] *Id.* art. 3155; *see also* LA. REV. STAT. § 9:4401(A) ("Any obligation may be secured by an assignment by a lessor or sublessor of leases or rents, or both leases and rents, pertaining to immovable property. Such assignment may be expressed as a conditional or collateral assignment, and may be effected in an act of mortgage, by a separate written instrument of assignment, or by a separate written instrument of pledge, and may be referred to, denominated, or described as a pledge or an assignment, or both.").

[37] LA. REV. STAT. §§ 9:4321, 9:4322 (repealed by 2001 La. Acts. 128). Although these provisions were repealed in 2001, *see* 2001 La. Acts 128, this repeal cannot be applied retroactively to the facts of this case because these provisions were substantive laws and the legislature did not express its intent to give the repeal of the substantive law retroactive effect, *see Billingsley v. Mitchell*, 676 So.2d 208, 212-13 (La. App. 1 Cir.), *writ denied*, 681 So.2d 1265 (La. 1996).

note.  The collateral assignment of rents specifically provides that Lifemark Hospitals, Inc. "shall not be obligated to perform or discharge nor does [Lifemark Hospitals, Inc.] hereby undertake to perform or discharge any obligation, duty or liability under said Lease."  As we observed, the renewal note itself gave Lifemark the right to release any security, including the collateral assignment of rents, under the renewal note.  In the face of these contractual provisions, holding the right to basic rent under the collateral assignment of rents imposed no duty upon Lifemark to preserve the lease covering the assigned rents.

We are persuaded that the district court erred as a matter of law in concluding that Lifemark breached any duties by failing to timely reinscribe the collateral mortgage, buy out the Travelers lien, add the Travelers debt to the debt owed by St. Jude to Lifemark Hospitals, Inc., and refrain from having Lifemark Hospitals of Louisiana, Inc. purchase the hospital at the foreclosure sale.  In sum, Lifemark did not owe the duties to St. Jude upon which the district court premised its order reversing the judicial sale of the hospital.  The district court erred in upsetting the confirmed judicial sale on these grounds.

B.

The district court pointed to its findings of Lifemark's bad faith, collusion, and self-dealing in forcing the judicial sale of the hospital, chilling the bidding at the sale, and purchasing the hospital as an alternative ground for its upset of the judicial

29

sale.  The district court relied upon two unpublished district court decisions setting aside a judicial sale.  Both were in admiralty and prior to sale confirmation.

That slender reed aside, the district court's findings of a "conspiracy" to wrest control of the hospital and medical office building from St. Jude and Liljeberg Enterprises border on the absurd.  We are left with the definite and firm conviction that a mistake has been committed, that the findings are not supported by the evidence and are clearly erroneous.

The district court's "conspiracy theory" conclusion is based, in part, on the view that Liljeberg Enterprises's or St. Jude's losses were caused by Lifemark.  Specifically, not reinscribing the collateral mortgage and not buying out the Travelers lien and adding the Travelers debt to the debt owed by St. Jude to Lifemark.  These findings turn on the remarkable but largely implicit conclusion, asserted directly by the Liljebergs' counsel at oral argument, that, under Louisiana law, a second mortgagee, which Travelers would have been had the collateral mortgage been timely reinscribed, cannot initiate foreclosure proceedings.  The district court and Liljeberg Enterprises offer no statutory or case law support for this proposition, for the simple reason that this is not the law.[38]

---

[38]  *See, e.g.*, *First Nat'l Bank of Gonzales v. Morton*, 544 So.2d 5 (La. App. 1 Cir.) (involving a prior successful foreclosure suit brought by a second mortgagee), *writ denied*, 550 So.2d 654 (La. 1989); *Keys v. Box*, 476 So.2d 1141 (La. App. 3 Cir. 1985) (involving a foreclosure suit brought by a bank to protect

The theory that Lifemark proximately caused any loss to Liljeberg Enterprises or St. Jude from the Travelers foreclosure on its judicial mortgage cannot accommodate the undisputed fact that, under Louisiana law, St. Jude could have reinscribed the collateral mortgage itself.[39]  A subordinate position for the Travelers judgment is now said to have been critical for St. Jude and its loss the centerpiece of a conspiracy to take the hospital.  Yet, St. Jude could have checked the records and protected its own interest.  That it could have and did not do so is telling.  It rends a large hole in the conspiracy claim and leaves St. Jude's inaction unexplained.  This, with the reality we have explained that Lifemark Hospitals, Inc. had no duty to buy out the Travelers lien, no duty to add the Travelers debt to the debt owed by St. Jude to Lifemark Hospitals, Inc., and no duty to prevent the purchase of the hospital at the foreclosure sale by Lifemark Hospitals of Louisiana, Inc.

Even if we were to somehow "explain" all of this by the theory that this foreclosure was part of Lifemark's plan from the

---

its interest as a second mortgagee); *Guinn v. Houston Fire & Cas. Ins. Co.*, 32 So.2d 613 (La. App. 1 Cir. 1947) (involving a foreclosure suit instituted by a second mortgagee).

[39]  *See* LA. CIV. CODE art. 3333 ("A person may reinscribe a recorded document creating a mortgage or evidencing a privilege by filing with a recorder a signed, written notice of reinscription."); *accord id.* art. 3369(E) ("The effect of the registry ceases in all cases, even against the contracting parties, unless the inscriptions have been renewed within the periods of time above provided in the manner in which they were first made, or by filing a notice of reinscription of mortgage or a written request for reinscription by the mortgagee *or any interested person*, together with a copy of the original act of mortgage." (emphasis added)) (repealed by 1992 La. Acts 1132).

beginning, the theory cannot be squared with one large undisputed fact: Liljeberg Enterprises and St. Jude faced the Travelers lien because of Liljeberg Enterprises's and St. Jude's own failed litigation against Travelers, arising out of an independent dispute with Travelers. Any suggestion that Lifemark somehow worked that result is defied by the record. Indeed, a panel of this court described the Liljebergs' conduct involved that litigation as "as egregious and unconscionable of bad faith contractual dealings as the members of this panel can recall having encountered."[40] The cases before us only reinforce that panel's observation. The record is clear that any losses by St. Jude and Liljeberg Enterprises were proximately caused by the Liljebergs, who defaulted to Travelers and whose post-default conduct, in part, led to the Travelers judgment and its resulting judicial mortgage and lien on the hospital. The foreclosure of this lien led to the foreclosure of the hospital that the district court order would set aside.

Indeed, despite Liljeberg Enterprises's contention on appeal that Lifemark's efforts to "circumvent" the pharmacy agreement and refusal to renew the medical office building lease caused St. Jude and Liljeberg Enterprises to experience significant shortfalls

---

[40] *Travelers Ins. Co. v. St. Jude Hosp.*, No. 92-9579, 21 F.3d 1107, at 2 (5th Cir. Apr. 20, 1994) (unpublished per curiam). The panel further noted that "[t]he Liljeberg conduct to which we refer is the antithesis of that mandated in La. Civil Code Ann. art. 1983 ('Contracts must be performed in good faith.'), and has contributed to the legal effects described in La. Civil Code Ann. art. 1997 ('An obligor in bad faith is liable for all damages, foreseeable or nor, that are a direct consequence of his failure to perform.')." *Id.* at 2 n.3.

32

which foreclosed any possibility of paying the note on the medical office building to Travelers, the district court made no findings of fact that Lifemark's conduct was the cause of the debt to Travelers or St. Jude's inability to pay that debt, which resulted in the judicial mortgage Travelers filed encumbering the hospital property.[41]

With or without such findings, however, the idea that Lifemark deliberately subordinated its mortgage interest to Travelers, knowing it would result in a required payment, *to wit*, approximately $7.8 million, to Travelers at any judicial sale, comes close to being nonsensical. It rests upon the assertion that Louisiana law somehow obligated Lifemark to lend the money to bail the Liljebergs out of their litigation fiasco with Travelers. That is so because, as we will explain, Travelers would most certainly have foreclosed its second mortgage. Although the district court made no such explicit finding, Liljeberg Enterprises argues on appeal that Lifemark deliberately failed to reinscribe its collateral mortgage in order to facilitate the Travelers foreclosure and the judicial sale of the medical office building and the hospital to Lifemark Hospitals of Louisiana, Inc., whereafter Lifemark conspired to manipulate the judicial sale,

---

[41] Nor, for that matter, did the district court make findings supporting two other premises of the Liljebergs' arguments on appeal: that Lifemark intentionally or deliberately failed to reinscribe the collateral mortgage or that Lifemark engaged in any fraud on the court or fraud with regard to the judicial sale.

33

colluded to minimize the price offered at the judicial sale, and schemed to terminate the lease and St. Jude's right to collect rents from Lifemark.

In answer to the palpable flaws in their theories, the Liljebergs would simply expand the conspiracy. They argue that this court should consider documents from Lifemark's legal malpractice suit against their former attorneys for their attorneys' failure to reinscribe the collateral mortgage and, more specifically, in a footnote in their original brief, the Liljebergs state for the first time that they "challenge the court's denial of their motion to supplement the record with documents from the trial between Lifemark and [its former attorneys]," which "documents clearly show that Defendants and their attorneys conspired to defraud St. Jude/Liljeberg Enterprises out the hospital, the lease, and the pharmacy." It tells that this argument was not raised or briefed as a separate issue until the Liljebergs' final reply brief. It is therefore waived.[42] Moreover, the district court ruled in an order dated April 25, 2000 that the Liljebergs' motion to supplement was rendered moot by the court's order and final judgment issuing its findings of fact and conclusions of law, which

---

[42] *See Price*, 256 F.3d at 368 n.2 (court of appeals does not consider issues raised for the first time in a reply brief); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 179 (5th Cir. 2000) (refusing to consider issue that were not raised or adequately briefed in the parties' opening briefs), *cert. denied*, 532 U.S. 1051 (2001); *Atwood v. Union Carbide Corp.*, 847 F.2d 278, 280 (5th Cir.) ("As we have already noted, issues not briefed, or set forth in the list of issues presented, are waived."), *amended on reh'g on other grounds*, 850 F.2d 1093 (5th Cir. 1988).

therefore quite obviously did not rely on the supplemental materials proffered with the motion. Under these circumstances, even if we were to consider this issue, the Liljebergs could not show an abuse of discretion on appeal.[43]

In sum, we conclude that the district court's findings that Lifemark engaged in bad faith, collusion, and self-dealing to force the judicial sale of the hospital, chill the bidding at the sale, and purchase the hospital are clearly erroneous. In the absence of any breach of duty to St. Jude or Liljeberg Enterprises on the part of Lifemark or a Lifemark breach having proximately caused any loss to the Liljebergs resulting from the Travelers lien, there is no bad faith or collusion in Lifemark's decision to bid at the judicial sale or Lifemark's purchase of the hospital at the legally-permitted two-thirds of its appraised value.

The other side of the no-duty coin is that Lifemark was free to act in its own self-interest, including allowing Lifemark, which had the license, to own and operate the hospital, and to escape the burden of the pharmacy agreement, which functioned much like an overriding royalty payment. As Lifemark persuasively argues on appeal, and the record is clear: the various lending and lease

---

[43] *See Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 360 n.7 (5th Cir. 1999) (standard of review for denial of motion to supplement the record is for abuse of discretion only); *Morales v. Turman*, 562 F.2d 993, 996 (5th Cir. 1977) (same).

Even assuming arguendo that the Liljebergs did not waive this issue on appeal and that we were to conclude that the district court abused its discretion in denying their motion to supplement, the supplemental material would not alter our conclusions on appeal.

transactions and instruments, as agreed to by the Liljebergs and Lifemark, permitted the outcomes which Lifemark sought in Lifemark Hospitals of Louisiana, Inc.'s bidding at the judicial sale as well as Lifemark's decision not to renew the lease on the medical office building.[44] Lifemark Hospitals, Inc. was legally entitled to obtain permission to bid credits, and received a court order granting such permission, to give it the option to bid at the sale should the circumstances warrant. The district court's findings and the Liljebergs' arguments on appeal offer no logical connection between a decision to seek authority to bid credits and the absence, let alone the chilling, of other bids on the hospital property at the judicial sale—the credits represent a debt Lifemark Hospitals, Inc. was owed, so a payment in cash and credits or simply in cash would make no difference for the bottom line in Lifemark's accounting. Moreover, although the Liljebergs argue that Lifemark's knowledge that the priority of the lease on the hospital and collateral assignment of rents would deter other bidders at the judicial sale somehow supports their conspiracy theory, it demonstrates quite the opposite. As counsel for Lifemark aptly noted at oral argument, the judicial sale could almost be considered "chill-proof," in that it is hard to imagine anyone bidding $26 million on a property that

---

[44] *Cf. Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297-98 (5th Cir. 1997) (under Louisiana law, it is not a breach of the implied covenant of good faith and fair dealing to engage in conduct which is expressly allowed under a contract).

would, by virtue of the lease and collateral assignment of rents, provide no cash-flow until at least sixteen years later, in 2010.

On the basis of its clearly erroneous "conspiracy theory" findings, the district court erred as a matter of law in disregarding long-standing Louisiana jurisprudence that a judicial sale, once completed, cannot generally be undone.[45] Freed from the district court's clearly erroneous "conspiracy theory" findings, the evidence concerning Lifemark's actions following Travelers's filing its judicial mortgage does not support findings of bad faith, collusion, and self-dealing on the part of Lifemark that would permit the district court to overturn the confirmed judicial sale.[46] Rather, the evidence considered against the entirety of the record shows that Lifemark's actions consisted of commercially

---

[45] *See generally Boyd v. Farmers-Merchants Bank & Trust Co.*, 433 So.2d 339, 342 (La. App. 3 Cir.) ("As a general rule, a judicial sale cannot be attacked once the sale is consummated in the absence of fraud or ill practices."), *writ denied*, 440 So.2d 732 (La. 1983).

[46] *Compare Acadian Prod. Corp. of La. v. Savanna Corp.*, 63 So.2d 141, 142 (La. 1953) ("Among the requirements for the legal seizure and sale of property in satisfaction of a judgment are to be found ... those prohibiting any combination or conspiracy to stifle competition and chill the bidding at a judicial sale."); *Pease v. Gatti*, 12 So.2d 684, 690 (La. 1942) ("This court has repeatedly held that, where there is an agreement to stifle competition at judicial sales and where one of the parties to the agreement is a party to the proceeding, the sale may be annulled by the injured party."); *Konen v. Konen*, 115 So. 490, 491 (La. 1928) ("Hence the concealment or misrepresentation of facts, amounting to fraud, is not the only cause for annulling a judicial sale, but anything said or done by one who becomes an adjudicatee, for the purpose of preventing competition at the sale, or, in other words, for the purpose of chilling it, which is reasonably capable of doing so, and has that effect, will be sufficient to annul the sale."); *First Nat'l Bank of Abbeville v. Hebert*, 111 So. 66, 69 (La. 1926) ("An agreement whereby parties engage not to bid against each other at a public auction, especially where the auction is required or directed by law, as in sales of property under execution, and where one of the parties to the agreement is a party to the proceeding, is a sufficient cause for annulling the sale.").

reasonable, albeit aggressive, steps in reaction to the Travelers judgment, all of which were within their contractual rights and applicable law.

We have detected several warring premises internal to the Liljebergs' theories. In concluding this section, we mention one more: the Liljebergs attempt to maintain both that Lifemark never intended to perform under the various commercial instruments between the parties and that Lifemark drafted these instruments to *allow* Lifemark to engage in conduct it challenges—declining to renew the lease on the medical office building, purchasing the hospital at a judicial sale, and terminating the pharmacy agreement based on a cross-default provision.

### C.

Lifemark argues that the district court erred in denying its claim for a deficiency judgment, a sum of $20,600,060.91 that St. Jude owed Lifemark Hospitals, Inc. under the renewal promissory note after Lifemark Hospitals of Louisiana, Inc.'s purchase of the hospital at the judicial sale.

The Liljebergs respond that the same bad faith and collusive conduct that tainted the judicial sale also bars any claim for deficiency and that the alleged defaults and acceleration were caused by the bad faith and collusive wrongdoing of Lifemark, which alone is legally responsible. The district court denied Lifemark's deficiency judgment claim based on its decision to overturn the

38

judicial sale, such that "[a]ll rents which would have been paid absent the judicial sale will be deemed paid on the mortgage in favor of [Lifemark Hospitals, Inc.] and the mortgage note shall be deemed current at the time of transfer," and, "[i]nasmuch as this Court has restored the status quo prior to sale and reinstated the collateral mortgage, collateral mortgage note, and note, the claim of [Lifemark Hospitals, Inc.] on the note is disallowed." Having found the district court's findings and conclusions in favor of this order to be in error, and rejected the Liljebergs' arguments on appeal, we must in turn reverse the district court's order denying this claim. As discussed *infra* in connection with the motion to assume the pharmacy agreement, the judicial mortgage and lien on the hospital won in court by Travelers and the judicial sale that followed were defaults under the fourth covenant of the collateral mortgage. These events of default gave Lifemark the contractually-secured right to accelerate the renewal promissory note and immediately recover all amounts and interest due thereunder.[47] We remand to the district court for calculation of

---

[47] The fourth covenant of the collateral mortgage provides:

The Property is to remain mortgaged and hypothecated until the full and final payment of the aforesaid indebtedness in principal and interest, attorney's fees, insurance premiums, costs and expenses, the Mortgagor hereby binding itself, its heirs, successors and assigns not to make a conveyance, mortgage, transfer or sale of the Property until full and final payment of the aforesaid indebtedness including principal and interest, attorney's fees, insurance premiums, costs and expenses, unless the Mortgagee expressly consents to such conveyance or mortgage in writing. The Mortgagor hereby agrees that should the Property be mortgaged, sold or transferred, either with or without the assumption of the aforesaid indebtedness, such sale, transfer or mortgage shall constitute a

39

the amount of deficiency owed to Lifemark Hospitals, Inc. and for entry of judgment in that amount.

D.

On its cross-appeal, Liljeberg Enterprises argues that the district court erred in requiring St. Jude and Liljeberg Enterprises to reimburse Lifemark the approximately $7.8 million it paid to Travelers. Having reversed the district court's order overturning the judicial sale, we must reverse the order of reimbursement, part of the district court's set-aside of the judicial sale. Because Lifemark will maintain ownership of the hospital pursuant to the confirmed judicial sale, the Liljebergs need not reimburse Lifemark's payment of the Travelers debt made at foreclosure. Liljeberg Enterprises's cross-appeal on this issue is now moot.[48]

## VI. Cause No. 93-1794

The district court concluded in Cause No. 93-1794 that Liljeberg Enterprises, as the debtor in possession in its Chapter 11 bankruptcy proceeding, should be allowed to assume the pharmacy

---

breach of this contract and the obligations herein set forth, and the Note shall, at the option of the Mortgagee, immediately mature and become due and payable, anything contained herein to the contrary notwithstanding, and it shall be lawful for the Mortgagee to proceed with enforcement of its mortgag as hereinabove set forth.

[48] We therefore assume, without deciding, that the Liljebergs did not waive this point of error by failing to raise it before the district court, notwithstanding that the relief they sought in seeking to alter or amend the district court's findings and judgment specifically requested only that the district court "defer the due date for reimbursing Lifemark with the amount of the Travelers judicial mortgage until after the single business enterprise has paid all the money judgments awarded in favor of Liljeberg Enterprises and St. Jude."

40

agreement pursuant to 11 U.S.C. § 365. The district court rejected Lifemark's arguments that the pharmacy agreement terminated under its own terms and was therefore not available to be assumed and that Liljeberg Enterprises committed incurable defaults under the pharmacy agreement which, pursuant to 11 U.S.C. § 365(b)(1), precluded an order granting Liljeberg Enterprises's motion to assume.

11 U.S.C. § 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor," but 11 U.S.C. § 1107(a) provides that, "[s]ubject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, ... of a trustee serving in a case under this chapter." Thus, as a debtor in possession, Liljeberg Enterprises was required to satisfy all the requirements of 11 U.S.C. § 365(b)(1) in order to assume the pharmacy agreement as an executory contract under section 365:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

41

(C) provides adequate assurance of future performance under such contract or lease.[49]

## A.

As an initial matter, Lifemark argues that the pharmacy agreement was no longer an executory contract subject to assumption. To determine if a contract is executory for purposes of this provision, "the relevant inquiry is whether performance remains due to some extent on both sides," such "that an agreement is executory *if at the time of the bankruptcy filing*, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[50]

Lifemark argues that the district court erred in treating the pharmacy agreement as an executory contract subject to assumption by Liljeberg Enterprises. They contend that, when Lifemark ceased to lease the hospital on October 28, 1994, the pharmacy agreement terminated by its own terms pursuant to section 5.1(e). It provides: "This Agreement shall be effective as set forth above and shall continue in full force and effect, unless sooner terminated

---

[49]   11 U.S.C. § 365(b)(1).

[50]   *Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.)*, 15 F.3d 60, 62-63 (5th Cir. 1994) (emphasis added); *accord Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996); *cf. Phillips v. First City, Texas-Tyler, N.A. (In re Phillips)*, 966 F.2d 926, 935 (5th Cir. 1992) (holding that a partnership agreement does not "remain[] an executory contract after the Final Judgment decreed that [one partner] breached the partnership agreement, awarded [another partner] damages, and ordered [the partnership] dissolved, and after passage of the Final Judgment's 90-day prescription for winding up [the partnership]").

with the first to occur of the following: ... (e) LIFEMARK ceases to lease or operate Hospital."

Liljeberg Enterprises filed for Chapter 11 relief on January 27, 1993. Lifemark's lease of the hospital did not end until almost twenty months later–when Travelers foreclosed and Lifemark bought the hospital at the judicial sale. There is no dispute but that throughout this period the pharmacy agreement was in full force and effect and a failure of either party to complete performance would have been a material breach.

Lifemark argues, however, that a line of authority out of the Tenth Circuit provides that "[a] contract that provides for termination on the default of one party may terminate under ordinary principles of contract law even if the defaulting party has filed a petition under the Bankruptcy Act."[51] Although this holding arose under the old Bankruptcy Act,[52] Lifemark argues that it remains valid under the Bankruptcy Code, pointing to a bankruptcy court's conclusion to that effect.[53] That Michigan bankruptcy court reviewed several decisions involving the issue of

---

[51] *Trigg v. U.S. Dep't of Interior (In re Trigg)*, 630 F.2d 1370, 1374 (10th Cir. 1980); *accord Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir. 1984).

[52] "The Bankruptcy Reform Act of 1978, Pub. L. 95-598, November 6, 1978, 92 Stat. 2549, repealed the former Bankruptcy Act of 1898 and replaced that Act with the Bankruptcy Code, Title 11 of the United States Code, effective October 1, 1979." *Mitsubishi Int'l Corp. v. Clark Pipe & Supply Co., Inc.*, 735 F.2d 160, 162 n.2 (5th Cir. 1984).

[53] *Hertzberg v. Loyal Am. Life Ins. Co. (In re B&K Hydraulic Co.)*, 106 B.R. 131, 134 (Bankr. E.D. Mich. 1989).

whether a contract terminated by its own terms or time limits post-petition and concluded that "the issue must be whether termination requires the non-debtor party to undertake some post-petition affirmative act," such that, "[w]hen termination of the contract requires an affirmative act of the non-debtor party, the contract remains executory because such an act is stayed under 11 U.S.C. § 362(a)," but, "[w]hen termination occurs *without any action by the non-debtor party*, the contract is no longer executory and no longer subject to assumption or rejection."[54]

The parties have pointed to no Fifth Circuit decisions treating this issue, and we have located none. The Liljebergs argue that even under this authority the pharmacy agreement did not terminate post-petition where Lifemark not only participated in the alleged defaults, they intentionally precipitated them; that, under the pharmacy agreement and Louisiana law, the pharmacy agreement could not terminate automatically but required Lifemark to place Liljeberg Enterprises in default and obtain judicial dissolution.

We agree and conclude that the district court did not err in concluding that the pharmacy agreement was an executory agreement subject to assumption by Liljeberg Enterprises. Lifemark's affirmative acts—its purchase of the hospital—caused the lease to be extinguished under the doctrine of confusion, which in turn

---

[54] *Id.* at 135-36 (emphasis added).

caused any alleged default under section 5.1(e) of the pharmacy agreement. Moreover, Louisiana law provides that, except in limited circumstances which the district court correctly concluded do not apply here, a contract will not terminate unless the non-breaching party seeks judicial dissolution of the contract or at least provides notice of the intent to exercise the right to terminate the contract for default, even if the contract explicitly provides for automatic termination.[55] And section 5.1(e) does not do so. Lifemark was required to give Liljeberg Enterprises written notice of termination under section 15 of the pharmacy agreement. In short, terminating the pharmacy agreement for default under section 5.1(e) required an affirmative act of Lifemark. Lifemark gave no notice and did not seek judicial dissolution. The pharmacy agreement remained executory.

B.

Turning then to whether the district court erred in allowing Liljeberg Enterprises to assume the executory pharmacy agreement, under section 365, "[a]n assumed lease or contract will remain in effect through and then after the completion of the reorganization," and "[t]he non-debtor party to the agreement is not released from its duties and must continue to perform; likewise, the debtor must continue to perform or pay for the

---

[55] *See* LA. CIV. CODE art. 2013 & cmts. (b)-(c); *id.* 2015, cmt. (c); *id.* 2017 & cmt. (b); *id.* 2024; *Mennella v. Kurt E. Schon E.A.I., Ltd.*, 979 F.2d 357, 361 & n.16 (5th Cir. 1992); *Pembroke v. Gulf Oil Corp.*, 454 F.2d 606, 611 (5th Cir. 1971).

45

services or other costs that are not discharged."[56] We have further explained that "'[t]he act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services,'"[57] a determination that assumption of the pharmacy agreement by Liljeberg Enterprises "represented a proper exercise of business judgment."[58]

Section 365(b)(1) essentially "'allows a debtor to 'continue in a beneficial contract provided, however, that the other party is made whole at the time of the debtor's assumption of said contract.''"[59] That is, "[s]ection 365 is intended to provide a means whereby a debtor can force another party to an executory contract to continue to perform under the contract if (1) the debtor can provide adequate assurance that it, too, will continue to perform, and if (2) the debtor can cure any defaults in its past performance."[60] As such, "the debtor party must take full account of the cost to cure all existing defaults owed to the non-debtor

---

[56] *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 505 (5th Cir.), *cert. denied*, 531 U.S. 871 (2000).

[57] *Id.* (quoting *MMR Holding Corp. v. C & C Consultants, Inc. (In re MMR Holding Corp.)*, 203 B.R. 605, 612 (Bankr. M.D. La. 1996)).

[58] *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

[59] *Nat'l Gypsum*, 208 F.3d at 505 (quoting *In re Eagle Bus Mfg., Inc.*, 148 B.R. 481, 483 (Bankr. S.D. Tex. 1992) (quoting *255 Turnpike Assocs. v. J.W. Mays, Inc. (In re J.W. Mays, Inc.)*, 30 B.R. 769, 772 (Bankr. S.D.N.Y. 1983))).

[60] *Richmond*, 762 F.2d at 1310.

party when assessing whether the contract is beneficial to the estate."[61] Further, to determine if the debtor in possession has provided "adequate assurance" of future performance, we have held that courts must look to "'factual conditions,'" including "consider[ation of] whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee."[62]

To the extent that such determinations turn on contested factual disputes, and not errors of law, we review only for clear error and not under *de novo* review.[63] Lifemark argues that, pursuant to 11 U.S.C. § 365(b)(1), the district court should have denied Liljeberg Enterprises's motion to assume because Liljeberg Enterprises's transactional and operational defaults under the pharmacy agreement are incurable and because Liljeberg Enterprises cannot provide adequate assurance of future performance.

Lifemark's arguments regarding transactional defaults require interpretation of several contractual documents. "The district court's interpretation of a contract is reviewed de novo," and "[t]he contract and record are reviewed independently and under the

---

[61] *Nat'l Gypsum*, 208 F.3d at 505.

[62] *Richmond*, 762 F.2d at 1310 (quoting *In re Sapolin Paints, Inc.*, 5 B.R. 412, 421 (Bankr. E.D.N.Y. 1980)).

[63] *See id.* at 1307-09 & n.4.

same standards that guided the district court."[64]  At the same time, "if the interpretation of the contract turns on the consideration of extrinsic evidence, such as evidence of the intent of the parties, the standard of review is clearly erroneous," but, if "intent is determined solely from the language of the contract, then contractual interpretation is purely a question of law," and "[t]he threshold question whether extrinsic evidence should be considered in determining the intent of the parties is itself a question of law and thus reviewable de novo."[65]

In this diversity case, we look to Louisiana law for the applicable standard of contract interpretation.[66]  "Under Louisiana law, a contract is the law between the parties, and is read for its plain meaning."[67]  Thus, "[u]nder Louisiana law, where the words of a contract are clear and explicit and lead to no absurd

---

[64] *St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 409 (5th Cir. 2000).

[65] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Circle, Inc.*, 915 F.2d 986, 989 (5th Cir. 1990) (per curiam); *see also Gebreyesus v. F.C. Schaffer & Assocs., Inc.*, 204 F.3d 639, 642 (5th Cir. 2000) ("Under Louisiana law, the interpretation of a contract and the determination of ambiguities are questions of law.  Where a court determines that ambiguity exists and makes factual determinations of intent, we review those factual findings for clear error." (citations omitted)).  As the district court correctly noted, the Louisiana Civil Code's contract interpretation provisions were substantially amended by Act 331 of 1984, which was enacted after the pharmacy agreement was entered into on February 10, 1983.  However, the cited provisions of the Civil Code and other principles of contract interpretation under Louisiana law cited and applied herein did not substantively change the law and so there are no retroactivity concerns presented by citing these post-Act 331 cases and Code provisions. *Cf. Morris v. Friedman*, 663 So.2d 19, 23-24 (La. 1995).

[66] *See Exxon Corp. v. Crosby-Mississippi Res., Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998).

[67] *Nat'l Union*, 915 F.2d at 989 (citation omitted).

consequences, the contract's meaning and the intent of its parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence," such that, "[i]f a court finds the contract to be unambiguous, it may construe the intent from the face of the document—without considering extrinsic evidence—and enter judgment as a matter of law."[68] Further, "'[u]nder Louisiana law, a contract is ambiguous when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.'"[69] Put another way, "under Louisiana law, 'when the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent,'" and "[t]his established rule of strict construction does not allow the parties to create an ambiguity where none exists and does not authorize courts to create new contractual obligations where the language of the written document clearly expresses the intent of the parties."[70]

The Liljebergs and the district court also rely on the rule that "under Louisiana law doubts or ambiguities as to the meaning

---

[68] *Am. Totalisator Co., Inc. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir. 1993).

[69] *Davis Oil Co. v. TS, Inc.*, 145 F.3d 305, 308 (5th Cir. 1998) (quoting *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996)).

[70] *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1326 (5th Cir. 1994) (quoting LA. CIV. CODE art. 2046).

of a contract must, if not otherwise resolvable, be eliminated by interpreting the contract against the party who prepared it."[71] The Supreme Court of Louisiana has applied this rule in the context of "an adhesionary contract," noting that "any contradiction or ambiguity should be construed against Titan, the party who drafted the policy," but that "[t]his general rule of construction ... only applies when there are two equally reasonable interpretations of the contractual provision in question."[72]

The statutory provision, Louisiana Civil Code article 2056, captioned "Standard-form contracts," provides both that, "[i]n case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text" and that "[a] contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." This language suggests it will primarily be applied to standard-form or adhesionary contracts or, as the Supreme Court of Louisiana has most often recently applied article 2056, to

---

[71] *Amoco Prod. Co. v. Forest Oil Corp.*, 844 F.2d 251, 255 n.7 (5th Cir. 1988); *accord Liljeberg Enters. Inc. v. Lifemark Hosps. of La., Inc.*, 620 So.2d 1331, 1334-35 (La. App. 4 Cir.) ("Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. 2046. The words of a contract must be given their generally prevailing meaning. LSA-C.C. 2047. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. 2050. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. LSA-C.C. 2056."), *writs denied*, 621 So.2d 818 (La. 1993). On appeal, Lifemark does not deny that it drafted the pharmacy agreement. *See id.* at 1338 (identifying "the attorney who drafted the agreement for Lifemark").

[72] *Lewis v. Hamilton*, 652 So.2d 1327, 1330 (La. 1995).

50

insurance contracts.[73]  Neither this court nor the Supreme Court of Louisiana has, however, confined the provision to these types of contracts.[74]

At the same time, we have held that, "while the jurisprudence of Louisiana has established a rule of contractual interpretation which construes ambiguity against the party drafting the document in question, neither party is deemed to be the scrivener when, as here, the initial draft is modified and remodified in a series of exchanges between the parties to produce an execution draft reflecting give and take between obligor and obligee."[75]

We first must answer whether the judicial lien and foreclosure of the hospital were defaults under the collateral mortgage and lease and, if so, whether they were transactional defaults under the pharmacy agreement's cross-default provision.  Section 5.1(b) of the pharmacy agreement provides:

---

[73] *E.g.*, *Succession of Fannaly v. Lafayette Ins. Co.*, 805 So.2d 1134, 1138 (La. 2002); *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 764 (La. 1994).

[74] *See, e.g.*, *United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re United States Abatement Corp.)*, 79 F.3d 393, 400 (5th Cir. 1996) (case involving oil platform maintenance contract); *Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 653 (5th Cir. 1989) (case involving mineral lease); *Brown v. Drillers, Inc.*, 630 So.2d 741, 754 n.20 (La. 1994) ("Applying this rule [Louisiana Civil Code article 2056] in contexts like this one is appropriate in that it recognizes the reality that the releasee is responsible for the broad release language and that any ambiguity should thus be construed against the releasee."); *cf. Mott v. ODECO*, 577 F.2d 273, 278 (5th Cir. 1978) (case involving master service contract relating to offshore oil-drilling platform) (applying pre-article 2056 rule in Louisiana Civil Code articles 1957 and 1958, which embodied the same general rule of Louisiana jurisprudence).

[75] *Shell Offshore, Inc. v. Marr*, 916 F.2d 1040, 1046 (5th Cir. 1990).

> This Agreement shall be effective as set forth above and shall continue in full force and effect, unless sooner terminated with the first to occur of the following: ... (b) Either party shall remain in breach of this Agreement for a continuous, unabated 30-day period after receipt of written notice of such breach from the other party. Should OPERATOR [Liljeberg Enterprises, Inc.]; or any of LIFEMARK's corporate affiliates, be in default of any other contractual agreement with LIFEMARK or any of LIFEMARK's corporate affiliates, including, but not limited to, the lease relating to the Hospital, then OPERATOR [Liljeberg Enterprises, Inc.] shall be in breach of this Agreement.

Section 5.1(b) placed the Liljebergs in breach of the pharmacy agreement by virtue of the default under the fourth covenant of the collateral mortgage through the sale of the hospital. That covenant provides that "[t]he Mortgagor [St. Jude] hereby agrees that should the [hospital] be mortgaged, sold or transferred, either with or without the assumption of the aforesaid indebtedness, such sale, transfer or mortgage shall constitute a breach of this contract and the obligations herein set forth."

Lifemark argues that the judicial mortgage and lien placed on the hospital was also a transactional default under the fourth and fifth covenants of the collateral mortgage. The fourth covenant provides in relevant part, in addition to the previously-quoted language, that "[t]he [hospital] is to remain mortgaged and hypothecated until the full and final payment of the aforesaid indebtedness ... the Mortgagor [St. Jude] hereby binding itself ... not to make a conveyance, mortgage, transfer or sale of the [hospital] until full and final payment of the aforesaid indebtedness ..., unless the Mortgagee [Lifemark Hospitals, Inc.]

52

expressly consents to such conveyance or mortgage in writing." The fifth covenant provides, in pertinent part, that "should there be created or suffered to be created any other lien or charges superior in rank to the lien and mortgage herein granted, ... then and in any of such events, the Note in principal and interest and all other indebtedness secured hereby shall, at the option of the Mortgagee [Lifemark Hospitals, Inc.] shall, at the option of the Mortgagee [Lifemark Hospitals, Inc.], immediately become due and payable ...." Finally, Lifemark argues that the Travelers lien created a default of the lease between St. Jude and Lifemark, which provides in Article 11.1, entitled "Warranty of Peaceable Possession and Title," that "[d]uring the Lease Term, LESSOR [St. Jude] represents and covenants that it will not create nor allow to exist any liens, encumbrances or charges relating to obligations of the LESSOR [St. Jude] affecting the Leased Premises except liens, such as paving, water and sewerage liens, resulting from a special assessment by a Governmental Authority and the Act of Collateral Mortgage ... and any other mortgage instruments now or hereafter executed to secure the [Lifemark Hospitals, Inc.] loan ... or otherwise agreed to in writing by [Lifemark Hospitals, Inc.]."

It is important to note that the collateral mortgage was signed by St. Jude and Lifemark Hospitals, Inc., not Liljeberg Enterprises and Lifemark Hospitals of Louisiana, Inc., while the lease of the hospital was signed by St. Jude and Lifemark Hospitals of Louisiana, Inc., not Liljeberg Enterprises and Lifemark

Hospitals of Louisiana, Inc. As a result, Lifemark argues on appeal that the first reference to Lifemark in section 5.1(b) of the CPA is a typographical error, and that the provision should read "or any of OPERATOR's corporate affiliates," such that any default of St. Jude, which is an affiliate of the "Operator," Liljeberg Enterprises, is a default under the pharmacy agreement.

The difficulty for Lifemark is that it is required to seek reformation or, to avoid absurdity, reading of the word "OPERATOR'S" into section 5.1(b) for "LIFEMARK'S." Lifemark has never whole-heartedly sought reformation and with good reason. Under Louisiana law, "[r]eformation is an equitable remedy that may be used when a contract between the parties fails to express their true intent, either because of mutual mistake or fraud."[76] Indeed, "[t]o establish the appropriateness of reformation, [Lifemark] had to prove by clear and convincing evidence that the [pharmacy agreement], as written, contained a mutual mistake and did not comport with the parties original intent."[77]

On this appeal, Lifemark stresses that the district court erred in rejecting its interpretation of section 5.1(b). The district court concluded that the language in section 5.1(b) could have been prepared for Liljeberg Enterprises's benefit so that a default by Lifemark or a Lifemark affiliate would have allowed

---

[76] *Edwards v. Your Credit Inc.*, 148 F.3d 427, 436 (5th Cir. 1998).

[77] *Duhon v. Mobil Oil Corp.*, 12 F.3d 55, 58 (5th Cir. 1994).

Liljeberg Enterprises to terminate the pharmacy agreement or seek damages. Lifemark replies that this suggested rational basis for the provision's otherwise embarrassing phrasing is not so simple. Rather, this rescue requires a finding that the scriveners made four errors in the provision, instead of the one error that would exist under Lifemark's interpretation. Lifemark's argument, while strong, is not clear and convincing evidence of mutual mistake or fraud in the formation of the pharmacy agreement.

Lifemark also says that John Liljeberg testified that the Travelers lien could cause a default under the pharmacy agreement's cross-default provision. As we read the testimony, Liljeberg did not admit any mutual mistake in the drafting of section 5.1(b) of the pharmacy agreement. Rather he indicated only that his attorney was concerned that the Travelers lien and foreclosure might sever the pharmacy agreement.

At the same time, "Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit."[78] Lifemark argues that the assertion that there was no typographical error in section 5.1(b) of the pharmacy agreement is untenable because it leads to the nonsensical result that, when read literally, section 5.1(b) provides that Liljeberg Enterprises would be in breach if a Lifemark affiliate

---

[78] *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 742 (5th Cir. 1998).

defaulted under an agreement with another Lifemark affiliate. Lifemark points out that this reading of section 5.1(b) is contrary to its plain language. That provision sets forth a default on "the lease relating to the Hospital" as an example of the type of breach that will trigger the cross-default provision. They note that, under Liljeberg Enterprises's reading, such a breach of the lease could not trigger the cross-default provision because it is not an agreement between Liljeberg Enterprises and a Lifemark affiliate or an agreement between two Lifemark entities.

This is a stronger argument for Lifemark's interpretation of section 5.1(b). Particularly so in light of several controlling standards for contract interpretation under Louisiana law: (1) Every provision of the contract must be interpreted in light of the contract's other provisions in order to give each provision the meaning suggested by the contract as a whole; (2) Contract provisions susceptible to different meanings should be interpreted so as not to neutralize or ignore any provision or treat any provision as mere surplusage and so as to preserve the validity of the contract; and (3) "'A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.'"[79] Only if these rules do not resolve the issue of how to interpret the

---

[79] *Id.* (quoting LA. CIV. CODE art. 2053).

contractual provision at issue should the provision be interpreted against the party that drafted it, which default rule applies, in any event, "only ... when there are two equally reasonable interpretations of the contractual provision in question."[80]

We conclude that Lifemark's interpretation of section 5.1(b), providing that "LIFEMARK'S" should be read as "OPERATOR'S" in the first reference in the provision, is the only construction of the provision which gives it the meaning suggested by the pharmacy agreement as a whole and which does not neutralize or ignore any provision or treat any provision as mere surplusage. In particular, this reading of section 5.1(b) makes sense of the example of the lease of the hospital between St. Jude and Lifemark Hospitals, Inc., which was signed only a month after Liljeberg Enterprises and Lifemark Hospitals of Louisiana, Inc. entered into the pharmacy agreement. In short, reading section 5.1(b) literally leads to absurd results, *inter alia*, that Liljeberg Enterprises would be required to answer for a default by one of Lifemark's corporate affiliates, whereas the interpretation advanced by Lifemark represents the most reasonable interpretation of the provision in question following the established rules of contract interpretation under Louisiana law.

We conclude that the district court erred in finding section 5.1(b) to be unenforceable and therefore severable from the

---

[80] *Lewis*, 652 So.2d at 1330.

pharmacy agreement pursuant to section 10 and in finding that "[t]he obligations contained in the [pharmacy agreement] are severable from St. Jude's obligations to [Lifemark Hospitals, Inc.] under the mortgage and [Lifemark Hospitals of Louisiana, Inc.] under the lease."

We further hold that the district court clearly erred in finding, largely implicitly, that the Travelers judicial mortgage and the judicial sale of the hospital were not defaults under the fourth covenant of the collateral mortgage. The district court also clearly erred in finding that "[t]he mortgage when viewed in tandem with the lease was incapable of default since the obligations owed by [Lifemark] under the lease would satisfy all of the obligations due by St. Jude to [Lifemark Hospitals, Inc.] under the terms of the financing." Under the express terms of the collateral mortgage, the hospital was not be mortgaged or sold. These events were breaches of the non-financial covenants of the collateral mortgage and the undisputed fact is that the hospital was both mortgaged and sold. It is no answer that the mortgage and sale resulted from Lifemark's actions and not Liljeberg Enterprises's or St. Jude's. The express language of the fourth covenant does not confine its prohibition of sales or mortgages of the hospital to events caused by St. Jude. We have already concluded that the district court clearly erred in finding the superior rank of the Travelers judicial mortgage and the resulting judicial sale of the hospital to have been the result of a breach

58

of fiduciary duties, bad faith, or collusion on the part of Lifemark. Moreover, the district court made no findings that Liljeberg Enterprises had cured or provided adequate assurance that it will promptly cure such a default, nor could the district court have done so on this record.

The Liljebergs, however, attempt to escape the effect of the default under the collateral mortgage by attacking the validity of the cross-default provision of the pharmacy agreement. These efforts are unavailing. The Travelers judgment which gave rise to the judicial mortgage and lien and subsequent judicial sale of the hospital did not occur solely because of Liljeberg Enterprises's financial condition upon the filing of its Chapter 11 bankruptcy petition. To assert that it did ignores the Liljebergs' bad faith conduct, as found by this court, in their dealings with Travelers. Contrary to the Liljebergs' assertion, relegated to a footnote, that the pharmacy agreement's cross-default provision is legally invalid because it impermissibly hinges on Liljeberg Enterprises's financial condition and ability to pay under the other contracts, the cross-default provision does not run afoul of the exceptions to 11 U.S.C. § 365(b)(1)'s requirements provided under sections 365(b)(2)(A) or 365(e)(1)(A).[81]

---

[81] See 11 U.S.C. § 365(b)(2)(A) ("Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—(A) the ... financial condition of the debtor at any time before the closing of the case ...."); *id.* § 365(e)(1)(A) ("Notwithstanding a provision in an executory contract ..., an executory contract ... of the debtor may not be terminated ..., at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—(A) the ... financial condition of the

There is non-binding authority from bankruptcy and district courts outside of this circuit, cited by the Liljebergs, for the propositions that cross-default provisions do not integrate otherwise separate transactions or leases and that section 365 prohibits the enforcement of cross-default provisions where enforcement would restrict the debtor's ability to assume an executory contract.[82] We agree with another bankruptcy court which recently synthesized these authorities and concluded that, while "cross-default provisions are inherently suspect," they are not *per se* invalid in the bankruptcy context, and "a court should carefully scrutinize the facts and circumstances surrounding the particular transaction to determine whether enforcement of the provision would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization."[83] Before finding that a cross-default provision involving a lease and non-lease agreements, including a note, similar to that here, was enforceable, the bankruptcy court concluded that "[f]ederal bankruptcy policy is offended where the non-debtor party seeks

---

debtor at any time before the closing of the case ...."). *Compare In re Plitt Amusement Co. of Wash., Inc.*, 233 B.R. 837, 847 (Bankr. C.D. Cal. 1999); *In re Sambo's Rests., Inc.*, 24 B.R. 755, 757 (Bankr. C.D. Cal. 1982).

[82] *See EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 597 (S.D.N.Y. 1992); *Braniff, Inc. v. GPA Group PLC (In re Braniff, Inc.)*, 118 B.R. 819, 845 (Bankr. M.D. Fla. 1990); *see also Plitt*, 233 B.R. at 847.

[83] *Kopel v. Campanile (In re Kopel)*, 232 B.R. 57, 64 (Bankr. E.D.N.Y. 1999).

enforcement of a cross-default provision in an effort to extract priority payments under an unrelated agreement," such that "[a] creditor cannot use the protections afforded it by section 365(b) (which requires curing of defaults and adequate assurances of future payments as a precondition to assumption of an executory contract or unexpired lease) in order to maximize its returns by treating unrelated unsecured debt as a *de facto* priority obligation."[84] As such, "where the non-debtor party would have been willing, absent the existence of the cross-defaulted agreement, to enter into a contract that the debtor wishes to assume, the cross-default provision should not be enforced," but "enforcement of a cross-default provision should not be refused where to do so would thwart the non-debtor party's bargain."[85] The court also noted that "[t]he fact that legally separate entities are parties to the various contracts does not of itself preclude enforcement of the cross-default provision" and that, "[w]here documents are contemporaneously executed as necessary elements of the same transaction, such that there would have been no transaction without each of the other agreements, the fact that nominally distinct parties executed the agreements will not preclude enforcement of a cross-default provision in favor of a party whose economic

---

[84] *Id.* at 65-66.

[85] *Id.* at 66.

interests are identical to those of the entity that is party to the document containing the cross-default provision."[86]

Here, there is ample support for the conclusion that the lease and collateral mortgage of the hospital are interrelated with the pharmacy agreement and that there would have been no pharmacy agreement without the lease of the hospital or the loan secured by the collateral mortgage. Indeed, the parties agreed in the pre-trial order that St. Jude would not have entered into the lease of the hospital to Lifemark if Lifemark had refused to enter into the pharmacy agreement with Liljeberg Enterprises.[87] It is true that the lease was signed a month after the pharmacy agreement was executed, but section 5.1(b) expressly contemplates "the lease relating to the Hospital" as an instrument covered by the cross-default provision. The parties also agreed that John Liljeberg signed a letter of intent dated December 20, 1982, with Lifemark concerning a proposal to develop St. Jude Hospital.[88] The district court, in considering the effectiveness of an alleged default under pharmacy agreement section 5.1(e), found that "although it is evident that the [pharmacy agreement] was a part of the overall transaction, it is not evident from the documents executed one month after the [pharmacy agreement] that the [pharmacy agreement]

---

[86]  *Id.* at 67.

[87]  Pre-Trial Order at 34 ¶ 23 (R. 9212).

[88]  *Id.* at 32 ¶ 4 (R. 9210).

62

was not severable from the remainder of the transaction," such that "a default under the [pharmacy agreement] would not collapse the loan or the Lease." That observation adds nothing. Non-enforcement of the cross-default provision, providing that a default under the collateral mortgage or lease would collapse the pharmacy agreement, would thwart Lifemark's bargain in agreeing to enter into the pharmacy agreement, all a part of the overall transaction to finance the building of the hospital through a loan secured by a collateral mortgage. Any finding, express or implied, to the contrary by the district court is clearly erroneous on the record before us.[89]

## C.

In sum, the district court erred in allowing Liljeberg Enterprises to assume the pharmacy agreement pursuant to 11 U.S.C. § 365. Liljeberg Enterprises's assumption of the pharmacy agreement is barred pursuant to 11 U.S.C. § 365(b)(1)(A) by defaults under the fourth covenant of the collateral mortgage in the form of the judicial mortgage placed on and judicial sale of the hospital, which in turn resulted in an incurable default under

---

[89] Likewise, the Liljebergs' unsupported contention in a footnote that principles of estoppel and waiver bar Lifemark's challenge to Liljeberg Enterprises's assumption because Liljeberg Enterprises would not be in bankruptcy were it not for Lifemark's actions is undermined by our conclusion that the district court clearly erred in its findings of bad faith and collusion and by the absence of any findings by the district court (or record evidence) that Lifemark's conduct was the cause of the debt to Travelers or St. Jude's inability to pay that debt, let alone Liljeberg Enterprises's Chapter 11 bankruptcy.

63

section 5.1(b) of the pharmacy agreement.[90]  We therefore reverse the district court's judgment in Cause No. 93-1794 granting Liljeberg Enterprises's motion to assume the pharmacy agreement.

## VII. Cause No. 93-4249

The district court in Cause No. 93-4249 ruled that Lifemark Hospitals of Louisiana, Inc., American Medical, and Tenet are liable to Liljeberg Enterprises for damages in the total amount of $12,432,905.92 for breach of payment due under the pharmacy agreement, specifically for the following: (1) $4,062,396 for Lifemark's failure to reimburse Liljeberg Enterprises its actual acquisition costs for the period August 31, 1989 through June 1, 1993; (2) $700,000 as lost profits for Lifemark's failure to purchase contrast media through the date of trial from Liljeberg Enterprises as required under the pharmacy agreement;[91] (3) $2,023,571 for Lifemark's wrongful disallowance of requested payment to Liljeberg Enterprises due to pricing differences and other items not specifically addressed in the district court's judgment through the date of trial; (4) $103,617 for Lifemark's wrongfully deducting bad debt allowances from its payments on the cost reimbursement portion of Liljeberg Enterprises's billing

---

[90]  In light of this conclusion, we need not address Lifemark's additional arguments regarding Liljeberg Enterprises's transaction defaults under the collateral mortgage and lease, operational defaults under the pharmacy agreement, or failure to provide adequate assurance of future performance under the pharmacy agreement.

[91]  Contrast media is a diagnostic drug for use in, *inter alia*, radiology procedures, which is generally swallowed or injected and which the district court found may come in a kit or may be purchased separately.

64

through the date of trial; (5) $150,275.60 for Lifemark's failure to implement minimum fee increases due to Liljeberg Enterprises under the pharmacy agreement through the date of trial; (6) $54,055 for Lifemark's failure to properly pay Liljeberg Enterprises under the pharmacy agreement for TPN fees and to reimburse Liljeberg Enterprises for chemotherapy kits provided to the nursing staff at the hospital;[92] (7) $281,906.32 for pricing and quantity differences; (8) $57,085 for Lifemark's failure to properly pay Liljeberg Enterprises for nitroglycerin and insulin supplied under the pharmacy agreement; and (9) an additional $5 million as damages through the date of trial. The district court also ruled that Liljeberg Enterprises is liable to Lifemark Hospitals of Louisiana, Inc., American Medical, and Tenet for $741,879, specifically $616,400 for Liljeberg Enterprises's overcharges on piggyback fees under the pharmacy agreement[93] and $125,479 for Liljeberg Enterprises's failure to pay Medicare reimbursement due to Lifemark Hospitals of Louisiana, Inc., American Medical, and Tenet under the pharmacy agreement through the date of trial. The district court denied all other claims by the parties for damages under the pharmacy agreement.

---

[92] The district court found that "Total Patenterals Nutrition ('TPN') is a combination of a highly caloric dextrose or sugar solution with protein additives prepared using the aseptic technique."

[93] The district court found that "[a]n 'IV piggyback' is a small volume of fluid that is used to administer mostly antibiotic ... medications to patients through an intravenous solution," and "[a]n additive is added to IV piggybacks in 90% of the IV piggybacks dispensed by [Liljeberg Enterprises]."

In the absence of an error of law, this court reviews the district court's award of damages for clear error only.[94] "If the award of damages is plausible in light of the record, a reviewing court should not reverse the award even if it might have come to a different conclusion."[95]

We have generally held that, "[w]hile the district court may not determine damages by speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."[96] Moreover, under Louisiana law, it is well-settled that "[a]ctual damages must be proven; they cannot be speculative or conjectural."[97] Thus, "[w]hile the breaching party should not escape liability because of difficulty in finding a perfect measure of damages, the evidence must furnish data for a reasonably accurate estimate of the amount of damages" such that it "appear[s] reasonably evident that the amount allowed rests upon a certain

---

[94] *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 277 (5th Cir. 2002); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 477 (5th Cir. 2001).

[95] *St. Martin*, 224 F.3d at 410.

[96] *Sulzer Carbomedics, Inc. v. Or. Cardio-Devices, Inc.*, 257 F.3d 449, 459-60 (5th Cir. 2001) (internal quotation marks omitted) (quoting *DSC Communications Corp. v. Next Level Communications*, 107 F.3d 322, 330 (5th Cir. 1997) (quoting *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 24 (5th Cir. 1974))).

[97] *Nat Harrison Assocs., Inc. v. Gulf States Utils. Co.*, 491 F.2d 578, 587 (5th Cir. 1974).

basis."[98]   More specifically, "Louisiana law is well-settled that lost profits 'must be proven with reasonable certainty and cannot be based on conjecture and speculation.'"[99]

The district court's findings of breaches of the pharmacy agreement meriting damage awards against Lifemark and many of Lifemark's arguments on appeal turn largely on interpretations of various provisions of the pharmacy agreement, which are generally governed by the standards we have described.  On appeal, the Liljebergs seek to go beyond the plain language of the pharmacy agreement on the basis of Lifemark's alleged drafting of the pharmacy agreement in bad faith.  The argument is that the contract was made deliberately ambiguous in order to injure Liljeberg Enterprises.  Likewise, the district court found ambiguity in almost every relevant provision of the pharmacy agreement which was not preclusively interpreted by the Louisiana state court in a prior case involving these parties.[100]  The district court further concluded that, based on testimony that Lifemark entered into the pharmacy agreement with the ultimate motive of terminating rather than abiding by the contract, the pharmacy agreement should be

---

[98]  *Id.; accord Mobil Exploration & Producing U.S., Inc. v. Cajun Constr. Servs., Inc.*, 45 F.3d 96, 101-02 & nn.18-19 (5th Cir. 1995).

[99]  *MAC Sales, Inc. v. E.I. du Pont de Nemours & Co.*, 24 F.3d 747, 753 (5th Cir. 1994) (quoting *Guy T. Williams Realty, Inc. v. Shamrock Constr. Co.*, 564 So.2d 689, 695 (La. App. 5 Cir.), *writ denied*, 569 So.2d 982 (La. 1990)).

[100]  *See Liljeberg Enters. Inc. v. Lifemark Hosps. of La., Inc.*, 620 So.2d 1331 (La. App. 4 Cir.), *writs denied*, 621 So.2d 818 (La. 1993).  Neither party challenges on appeal the district court's determination of issue preclusion.

interpreted against Lifemark where the pharmacy agreement is susceptible to more than one interpretation.  However, as Lifemark aptly points out on appeal, Liljeberg Enterprises never argued that the contract was fraudulently induced and the record shows that John Liljeberg was fully apprised of the pharmacy agreement's terms and was represented by counsel and pharmacy consultants when he negotiated the agreement and understood the agreement that he signed on behalf of Liljeberg Enterprises.  Under these circumstances, in the absence of ambiguity, we look to the clear and explicit language within the four corners of the pharmacy agreement to determine the pharmacy agreement's meaning and the intent of its parties.

On appeal, Lifemark challenges several of the district court's damage awards to Liljeberg Enterprises.[101]  We will address each challenge in turn.

A.

Lifemark argues that the district court erred in awarding $5 million for Liljeberg Enterprises's "circumvention claim" based upon Liljeberg Enterprises's theory that Lifemark "circumvented" the pharmacy agreement, and thereby avoided paying Liljeberg Enterprises, by not paying Liljeberg Enterprises for each

---

[101]  Lifemark does not appeal the district court's awards of $103,617 for bad debt deductions and $54,055 for chemotherapy kits and TPN fees, nor the district court's failure to award $753,952 for Liljeberg Enterprises's denial of Medicaid reimbursements.  Likewise, the Liljebergs do not appeal the order to repay $616,400 for I.V. piggyback fee overcharges and $125,479 for Medicare reimbursement denials.

administered dose of drugs provided by Liljeberg Enterprises and obtaining drugs from other sources. Lifemark contends that these claims fail because they are based upon erroneous interpretations of sections 2.6 and 4.1 of the pharmacy agreement and because, in any event, by relying solely on a procedurally flawed audit of patient charts, Liljeberg Enterprises failed to adequately prove damages. Lifemark also contends that the $5 million award for "circumvention" overlaps impermissibly with the $700,000 award for lost profits on contrast media (based upon Liljeberg Enterprises's argument under section 2.6(a)) and the $57,085 award for insulin and nitroglycerin underpayments (based upon Liljeberg Enterprises's argument under section 4.1).[102]

The provisions of the pharmacy agreement at issue here are sections 2.6 and 4.1 and Exhibit B. Section 2.6(a) provides:

> OPERATOR [Liljeberg Enterprises, Inc.] shall not provide, nor be entitled to any compensation, for the following: (a) all drugs and supplies utilized by the ancillary departments of the Hospital in preparation for, during, or immediately following departmental patient related procedures, except those patient identifiable charges in which the cost of the drug is not included in a fee or charge for that procedure. Ancillary departments shall include, but not be limited to, radiology, anesthesiology, and clinical labs ....

Section 4.1 provides in pertinent part:

> (a) As compensation for those pharmaceutical services provided by OPERATOR [Liljeberg Enterprises, Inc.] as specified above, and for pharmaceuticals and intravenous

---

[102] *See Nat'l Tea Co. v. Plymouth Rubber Co., Inc.*, 663 So.2d 801, 811 (La. App. 5 Cir. 1995) (holding that "the allowance of a double recovery in a contractual situation, in which the damages are fixed, is inappropriate").

solutions furnished hereunder to inpatients or emergency room patients, LIFEMARK shall pay to OPERATOR [Liljeberg Enterprises, Inc.] the fee per procedure as shown on Exhibit B, which is attached hereto and incorporated herein for all purposes less 5% of such total of the fees per procedure as allowance, for bad debt. The allowance for bad debt shall be reviewed after each fiscal year of the Hospital and changed to reflect the actual percentage of uncollectable accounts for the preceding fiscal year of the Hospital.

Exhibit B, in turn, provides:

LIFEMARK shall reimburse the OPERATOR [Liljeberg Enterprises, Inc.] the greater of (i) the minimum fee set forth below or (ii) a fee equal to 1.35 times cost as identified by invoice.

| Drug Category | Minimum Fee |
|---|---|
| Orals | |
| Solid | $ .53 |
| Liquid | .63 |
| CII Controlled Drug | .56 |
| Suppositories | .53 |
| Parenterals | |
| Per Dose | 2.80 |
| CII Controlled Drug | 3.00 |
| Partial Fill I.V.'s (Piggybacks) | 5.25 (includes cost of solution) |
| Miscellaneous | |
| Opthalmics, Externals, Otics, etc. | 1.40 |

Fees for items or categories not identified above shall be established in a manner consistent with the development schedule.

LIFEMARK shall reimburse the OPERATOR [Liljeberg Enterprises, Inc.] a flat fee for handling the following items:

| | |
|---|---|
| I.V. Handling fee for Non-Additive, large volume parenterals | $ 1.00 |
| I.V. Additive Fee | 1.70 |

i.

70

Lifemark argues that the district court erroneously interpreted section 4.1(a)'s provision for "the fee per procedure as shown on Exhibit B" to mean that Liljeberg Enterprises was entitled to a new fee each time a dose of the same drug or drug combination was administered by a nurse or physician, even if Liljeberg Enterprises performed no new pharmaceutical service. Lifemark contends that section 4.1(a)'s "fee per procedure" provision is unambiguous and simply means that Liljeberg Enterprises is entitled to a single fee for each drug dispensed by Liljeberg Enterprises's pharmacy, irrespective of whether a nurse or doctor later administers a dose or doses of the drug in a multi-step process.

The state court's preclusive holding establishes that, under section 4.1(a), Liljeberg Enterprises is entitled to receive reimbursement for actual acquisition costs in addition to the "fee per procedure" set forth in Exhibit B.[103] The question left unanswered by the state court decision, however, and squarely presented in this case is whether "fee per procedure" should be understood to authorize Liljeberg Enterprises to receive a fee per drug dispensed or pharmaceutical service provided by Liljeberg Enterprises's pharmacy or a fee per administered dose, as the district court found. The district court concluded that the phrase

---

[103] *Liljeberg Enters.*, 620 So.2d at 1335-36.

"per procedure" is ambiguous and therefore turned to extrinsic evidence.

This conclusion is correct if the parties' intent as to the meaning of this provision of section 4.1(a) is uncertain and this provision is susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.[104] The term "procedure" is nowhere defined in the pharmacy agreement and is, in fact, used in several different contexts within this contract, including "departmental patient related procedures" and "the Hospital's policies and procedures." Lifemark argues that the per-administered-dose meaning is not reasonable because it would compensate Liljeberg Enterprises for services performed by other hospital employees or departments, such as nurses administering medication, and not simply for services Liljeberg Enterprises actually performed. As support for this argument, Lifemark notes that section 4.1(a) provides that the "fee for procedure" shall be paid "[a]s compensation for those pharmaceutical services provided by [Liljeberg Enterprises] as specified above, and for pharmaceuticals and intravenous solutions furnished hereunder to inpatients or emergency room patients." Section 2.4 provides that "pharmaceutical services" includes "without limitation, drugs, medicines, and intravenous solutions." Even the most expansive, reasonable meaning attributable to

_____

[104] *See Davis Oil*, 145 F.3d at 308.

"pharmaceutical services" under the pharmacy agreement would not include services performed by other hospital employees or departments within the scope of "pharmaceutical services provided by [Liljeberg Enterprises]."

However, section 4.1(a) also provides that the "fee per procedure" shall be paid "for pharmaceuticals and intravenous solutions furnished hereunder to inpatients or emergency room patients." In light of this language, the ordinary meaning of "procedure" could reasonably encompass either meaning attributed by the parties to "fee per procedure." Moreover, the district court's interpretation of "fee per procedure" does not neutralize or ignore or treat as mere surplusage any other provision of the pharmacy agreement. Under these circumstances, we conclude that the district court did not err in concluding that the phrase "fee per procedure" in section 4.1(a) is ambiguous and looking to extrinsic evidence.

Having found ambiguity exists in section 4.1(a), we review the district court's factual determinations of intent for clear error only.[105] Lifemark argues that compensation per dose administered results in grossly excessive charges. Additionally, Lifemark notes that the district court interpreted the "fee per procedure" phrase to apply differently to heparin flush kits and contends that there is no reasoned basis for interpreting "per procedure" differently

---

[105] *See Gebreyesus*, 204 F.3d at 642.

according to the type of drug dispensed when the pharmacy's involvement is the same.[106]  However, Lifemark offers no persuasive argument on appeal that there is clear error in the district court's finding, based on witness testimony, that the parties intended for Liljeberg Enterprises to be compensated for each unit administered with respect to the administration of multiple units of medication or multiple administrations of medication from single vials of medicine.  We therefore conclude that the district court's interpretation of section 4.1(a)is correct.[107]  The district court's additional finding that heparin flush kits are distinguishable because allowing Liljeberg Enterprises compensation for each step in the process and each legend drug item contained in a kit would involve multiple reimbursement for a single, one-time process of administering the kit is consistent with the district court's general finding and is also not clearly erroneous.

ii.

Turning to section 2.6(a) of the pharmacy agreement, Lifemark argues that the district court erred in ruling that Lifemark was

---

[106]   The district court's unchallenged factual finding was that "[a] 'heparin flush kit' consists of three separate items that are administered at one time and are in essence a single procedure or dose."

[107]   Lifemark also argues that the district court erred in failing to award Lifemark $51,771 as reimbursement for overpayments for multiple doses of nitroglycerin and insulin, where Liljeberg Enterprises charged multiple fees for the pharmacy's single act of dispensing these medications, and, based on the same reasoning, Lifemark contends that the district court erred in awarding $57,085 for Lifemark's alleged underpayments to Liljeberg Enterprises for nitroglycerin and insulin supplied under the pharmacy agreement.  On the basis of our conclusion that the district court's interpretation of "fee for procedure" in section 4.1(a) is not in error, we reject these points of error as well.

74

required to compensate Liljeberg Enterprises for certain bulk drugs, such as contrast media and surgery kits, which Lifemark purchased directly from drug wholesalers and which were sent to ancillary departments of the hospital for administration by doctors or nurses.[108] According to Lifemark, the district court held that compensation was due Liljeberg Enterprises because section 2.6(a)'s excluding compensation to Liljeberg Enterprises for these drugs was illegal and was superceded by the Tenet policy manual. The argument is that the district court included this unspecified compensation in its $5 million award to Liljeberg Enterprises.

The district court's actual findings and conclusions on this matter are somewhat different, however, and hinge on the following propositions. Liljeberg Enterprises was the exclusive, licensed hospital pharmacy for the hospital, and the parties intended that Liljeberg Enterprises would have the exclusive right to furnish all drugs to all departments at the hospital except for specific exclusions set forth in section 2.6. Louisiana and federal law do not require that kits which include legend drugs be purchased from Liljeberg Enterprises, but the law does require that Liljeberg Enterprises oversee the storage and dispensing of these items. However, Tenet policy requires that the hospital pharmacy procure, store, distribute, and control all pharmaceuticals used within the

---

[108] Surgery kits contain a combination of legend drugs such as Lidocaine and non-legend supplies used during surgical procedures.

hospital,[109] and the pharmacy agreement requires that all drugs to be administered to patients at the hospital be purchased from Liljeberg Enterprises, other than those drugs for which a specific exclusion exists under the pharmacy agreement, *e.g.*, pursuant to section 2.6. Thus, Lifemark should have involved Liljeberg Enterprises in procuring, storing, and dispensing any drugs or kits which required the intervention of a licensed pharmacist under applicable law. Lifemark failed to do so in ordering legend drugs or kits containing legend drugs from sources other than Liljeberg Enterprises, including by use of Liljeberg Enterprises's pharmacy permit without Liljeberg Enterprises's permission,[110] and by storing and dispensing legend drugs through the hospital's Materials Management Department, bypassing the hospital pharmacy, in contravention of the pharmacy agreement.

Thus, the district court did not conclude that section 2.6(a) is illegal *per se*. Nor did it conclude that Liljeberg Enterprises was required by state or federal law to purchase all drugs or kits containing legend drugs for use in the ancillary departments of the hospital in preparation for, during, or immediately following departmental patient related procedures. Rather, it decided that,

---

[109] The district court found that Tenet's Pharmacy Policy & Procedure Manual gave Liljeberg Enterprises, as the hospital's pharmacy department, the responsibility to store, control, and distribute all drugs, including non-legend drugs, for use in ancillary departments, resting on the manual's general statement that the general purpose of the pharmacy department is the procurement, distribution, and control of all pharmaceuticals used within the hospital.

[110] There is no dispute that only Liljeberg Enterprises possessed the relevant hospital pharmacy permit for the hospital required under Louisiana law.

where state and federal law requires Liljeberg Enterprises's involvement with legend drugs used by the ancillary departments of the hospital, section 2.6(a) must not be read to bar Liljeberg Enterprises from entitlement to compensation under the pharmacy agreement.

Lifemark argues, however, that where section 2.6(a) states that Liljeberg Enterprises will neither "provide" nor be compensated for drugs used in ancillary departments, including legend drugs, but does not prohibit Liljeberg Enterprises from providing oversight or other services which the court has found to be necessary, section 2.6(a) is entirely consistent with the district court's finding that Lifemark could lawfully purchase legend drugs. Lifemark also argues that there is no evidence of illegality; that a Louisiana Board of Pharmacy inspector found no violations where the drugs were distributed on doctors' orders and the administration of the drugs was ultimately reviewed by the hospital pharmacy.[111] Lifemark contends that the district court erred in discounting this evidence (along with testimony that, even if it is against the letter of the law, many hospitals store and dispense pharmaceuticals out of ancillary departments), because, in the view of the district court, the Board's non-action against

---

[111] Lifemark concedes that an inspector for the Louisiana Department of Health and Hospitals testified that he concluded that legend drugs were being stored and dispensed from the Materials Management Department without the supervision of a pharmacist, but notes that he also admitted that his normal job responsibility was to inspect hospitals for federal reimbursements and that he would defer to Louisiana Board of Pharmacy on the interpretation and enforcement of Louisiana pharmacy laws.

Lifemark appeared to be the result of the Board's desire to stay out of a contract dispute between two private entities and "because the exercise of discretion by the Board of Pharmacy cannot abrogate black letter law."

Finally, Lifemark argues that the district court erred in refusing to reopen the record to allow evidence from a trial in another lawsuit filed by Liljeberg Enterprises's former pharmacy director James Witchen against Lifemark Hospitals of Louisiana, Inc., a Lifemark employee, Tenet, and Liljeberg Enterprises.[112] This evidence showed that the Louisiana Board of Pharmacy found that Lifemark's handling of legend drugs was not a violation of pharmacy laws. Lifemark argues that this refusal works an injustice to it and constitutes an abuse of discretion.[113]

We conclude that the district court erred in concluding that section 2.6(a) denies Liljeberg Enterprises compensation for its

---

[112] Witchen's suit stemmed from Lifemark's request, pursuant to its rights under the pharmacy agreement, that Liljeberg Enterprises remove Witchen as pharmacy director.

[113] The standard for deciding whether the district court erred in denying a motion to reopen is well-settled:

> We review for abuse of discretion a district court's ruling on a party's motion to reopen its case for the presentation of additional evidence. The court's decision "will not be disturbed in the absence of a showing that it has worked an injustice in the cause." Among the factors the trial court should examine in deciding whether to allow a reopening are the importance and probative value of the evidence, the reason for the moving party's failure to introduce the evidence earlier, and the possibility of prejudice to the non-moving party.

*Garcia v. Woman's Hosp. of Tex.*, 97 F.3d 810, 814 (5th Cir. 1996) (citations omitted; quoting *Gas Ridge, Inc. v. Suburban Agric. Props., Inc.*, 150 F.2d 363, 366 (5th Cir. 1945)).

required involvement in the procuring or purchasing and distribution, as opposed to the dispensing, of the legend drugs or kits. However, the district court did not err insofar as it concluded that Liljeberg Enterprises should have been involved with the storage of the legend drugs or kits at issue and compensated accordingly under the pharmacy agreement.

The district court's conclusion turns on whether applicable state or federal law required Liljeberg Enterprises to purchase, procure, store, distribute, or dispense legend drugs or kits containing legend drugs, which would prohibit a reading of section 2.6(a) to exclude compensation to Liljeberg Enterprises for rendering these services to "provide" such drugs for use by the ancillary departments of the hospital.[114]

Turning first to federal law, neither the district court nor the Liljebergs point to any relevant statutes, and we have found none, which prohibit the hospital's practice of the Materials Management Department's ordering, storing, and distributing legend drugs, which are not "controlled substances," to doctors or nurses in the ancillary departments of the hospital to administer to

---

[114] Section 2.6(a) provides that Liljeberg Enterprises "shall not *provide, nor be entitled to any compensation*, for ... (a) all drugs and supplies utilized by the ancillary departments of the Hospital in preparation for, during, or immediately following departmental patient related procedures, except those patient identifiable charges in which the cost of the drug is not included in a fee or charge for that procedure." (emphasis added).

patients on doctors' orders.[115]  Furthermore, although the district court found that American Medical and Tenet used Liljeberg Enterprises's pharmacy permit without Liljeberg Enterprises's permission to order drugs, the court made no further findings that these drugs were controlled substances for which 21 U.S.C. § 822 requires registration with the United States Attorney General, and the record does not support a finding that Liljeberg Enterprises's "circumvention claim" involves any legend drugs which are controlled substances.

This issue presents a classic *Erie* question as to what state law requires, which we review *de novo*.[116]  The competing views of officials from the Louisiana Board of Pharmacy and the Louisiana Department of Health and Hospitals on the question of what Louisiana law required as to the procurement or purchasing, storage, and dispensing or distributing of legend drugs at the hospital are of no moment in this analysis and entitled to no deference.  Although the regulations upon which the district court relied were promulgated by the Board of Pharmacy of the Louisiana Department of Health and Hospitals, the views upon which the parties rely are not the sort of final decision of a state agency

---

[115]  *See* 21 U.S.C. § 353(b)(1)(ii) (requiring that certain drugs be dispensed only "upon a written prescription of a practitioner licensed by law to administer such drug"); *id.* § 822 (governing persons required to register with the United States Attorney General in order to dispense any "controlled substance").

[116]  *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991).

embodying the agency's interpretation of its own regulations to which Louisiana courts will give deference.[117] For this reason, the district court was entirely within its discretion in denying Lifemark's motion to supplement the record with evidence that the Louisiana Board of Pharmacy rejected Liljeberg Enterprises's complaints to the Board that Lifemark's hospital departments were dispensing drugs in violation of state pharmacy laws and that the Board rejected the complaints because it failed to find any violation of the pharmacy laws.

In concluding that "[t]he law only requires that [Liljeberg Enterprises] oversee the storage and dispensing of [items containing legend drugs]," the district court discussed only regulations promulgated by the Board of Pharmacy of the Louisiana Department of Health and Hospitals which govern "hospital pharmacies."[118] These regulations, however, do not specifically require the hospital pharmacy or pharmacist-in-charge to be involved in the purchasing, procurement, or distribution of legend drugs to doctors or nurses in the ancillary departments of the

---

[117] *Cf. Matter of Recovery I, Inc.*, 635 So.2d 690, 697 (La. App. 1 Cir.), *writ denied*, 639 So.2d 1169 (La. 1994); *cf. also Laidlaw Envtl. Servs., Inc. v. La. Pub. Serv. Comm'n*, 752 So.2d 748, 751 (La. 1999) (noting that the Louisiana Public Service Commission is entitled to deference in its interpretations of its own rules and regulations but not in its interpretation of statutes and judicial decisions).

[118] *See* LA. ADMIN. CODE tit. 46, pt. LIII, § 2501; *id.* § 2503; *id.* § 2507(B); *id.* § 2513; *id.* § 2519(A); *id.* § 2523(A).

81

hospital to administer to patients on doctors' orders.[119] Our review of Louisiana law convinces us that the Materials Management Department's "distributing" legend drugs to doctors or nurses in the ancillary departments of the hospital to "administer" to patients on doctors' orders constituted "distribution" and was not "dispensing," as the district court described it. Louisiana law in effect at the relevant time did not require that this work be supervised or done by a pharmacist.[120] Neither the district court

---

[119] *See id.* § 2501 ("A hospital pharmacy is a pharmacy department located in a hospital facility licensed under R.S. 40:2000 et seq., [1986] by the Louisiana Department of Health and Hospitals. Hospital pharmacy represents an inpatient primary care treatment modality pharmacy."); *id.* § 2503(A) ("A hospital pharmacy permit shall be required to operate a pharmacy for possession, dispensing, and delivering legend prescription orders to patients in a hospital."); *id.* § 2511(A) ("Hospital dispensing is the issuance of one or more unit doses of medication in a suitable container, by a pharmacist, properly labeled for subsequent administration ...."); *id.* § 2513 ("Prescription legend drugs may be dispensed from the hospital pharmacy only upon orders of a licensed medical practitioner."); *id.* § 2517(A) ("All drugs dispensed by a hospital pharmacy, intended for use within the facility, shall be dispensed in appropriate containers and adequately labeled as to identify patient name, room number, trade mark, chemical or generic name, and strength of the medication."); *id.* § 2519(A) ("Drugs may be dispensed and administered only upon the prescription orders of licensed authorized prescribers."); *id.* § 2523(A) ("The hospital pharmacy shall be under the direct control and supervision of a pharmacy director who is a Louisiana licensed pharmacist, serves as pharmacist-in-charge and is competent in the specialized functions of a hospital pharmacy located in a primary care treatment modality."); *id.* § 2529(A)(1) ("The annual hospital pharmacy inspection review shall verify the following. 1. Dispensed Drugs. Prescription orders are dispensed exclusively by licensed pharmacists to inpatients."); *accord id.* § 3501(A) ("Legend Drugs. A legend drug is a medication which must only be dispensed by a pharmacist on the order of a licensed practitioner and shall bear the following notation on the label of a commercial container: 'caution: federal law prohibits dispensing without a prescription' (Ref. R.S. 40:1237, et seq. [1982] and U.S.C. 21:353(b) [1987])."); *id.* § 3501(A)(1) ("Dispensing. Legend drugs shall be dispensed only by a licensed Louisiana pharmacist."); *id.* § 3501(A)(3) ("Possession. Legend drugs shall be procured and possessed by a pharmacy permittee for legitimate dispensing by a pharmacist in the course of the practice of pharmacy, unless otherwise provided by law.").

[120] It is important to distinguish between "dispensing," "administering," "delivering," and "distributing" drugs. Under Louisiana law, "'[a]dminister' or 'administration' means the direct application of a drug to the body of a patient or research subject by injection, inhalation, ingestion, or any other means."

nor Liljeberg Enterprises point us to any other controlling Louisiana law then in force that would prohibit the role of the Materials Management Department in ordering and distributing the drugs and kits at issue, and we have located no Louisiana case law or statute in effect at the relevant time which would do so.

The Louisiana legislature later changed the law to require just what the district court found to be the law at the time of Lifemark's alleged "circumvention" pursuant to the various hospital pharmacy regulations. The Louisiana legislature in 1999, after the events which allegedly gave rise to Liljeberg Enterprises's "circumvention claim," enacted Louisiana Revised Statutes § 37:1224(F). This section provided that "[a]ll procurement, delivery, dispensing, and distribution of federal legend and controlled drugs that are purchased for and administered to patients inside a hospital licensed under R.S. 40:2100, et seq. shall be procured, delivered, dispensed, and distributed under the direction of the pharmacist-in-charge of that hospital."[121]  The

---

LA. REV. STAT. § 37:1164(1); *accord id.* § 40:961(2). "'Deliver' or 'delivery' means the actual, constructive, or attempted transfer of a drug or device from one person to another, whether or not for a consideration." *Id.* § 37:1164(8); *accord id.* § 40:961(10). On the other hand, "'[d]ispense' or 'dispensing' means the interpretation, evaluation, and implementation of a prescription drug order, including the preparation and delivery of a drug or device to a patient or patient's agent in a suitable container appropriately labeled for subsequent administration to, or use by, a patient," such that "'[d]ispense' necessarily includes a transfer of possession of a drug or device to the patient or the patient's agent." *Id.* § 37:1164(10); *accord id.* § 40:961(13). Finally, "'[d]istribute' or 'distribution' means the delivery of a drug or device other than by administering or dispensing." *Id.* § 37:1164(11); *accord id.* § 40:961(14).

[121]  LA. REV. STAT. § 37:1224(F) (repealed by 2000 La. Acts 83). Section 37:1224(F) was repealed the year after its enactment. *See* 2000 La. Acts 83.

legislature explicitly noted in Act 767, in which it enacted section 37:1224(F), that section "37:1224(F) is all new law."[122] Yet, because the Legislature did not expressly provide for this new substantive law to apply retroactively, section 37:1224(F) is not applicable to this case.[123]

Regulations from the Board of Pharmacy Louisiana Department of Health in force at the relevant time, however, provided that "[l]egend drugs shall be stored in a licensed pharmacy under the immediate control and responsibility of a pharmacist."[124] On appeal, Lifemark does not challenge the district court's finding that "Materials Management is merely a department of the hospital, is not a pharmacy and is not under the control or direction of a licensed pharmacist."[125] Lifemark instead points us to the testimony of the Louisiana Board of Pharmacy inspector that a sanitary permit issued by the Louisiana Department of Health and Hospitals to Lifemark gave the hospital the authority to hold and store prescription drugs outside of the hospital pharmacy. But Lifemark points us to no controlling Louisiana law which codifies or confirms this authority, and our own research has located none.

---

[122] *See* 1999 La. Acts 767.

[123] *See id.; see generally Jacobs v. City of Bunkie*, 737 So.2d 14, 20 (La. 1999).

[124] LA. ADMIN. CODE tit. 46, pt. LIII, § 3501(A)(4).

[125] The district court also found that Liljeberg Enterprises "and its pharmacy director have recently been given the ability to supervise and oversee the storage of the kits containing legend drugs."

84

On the basis of our review of Louisiana law in force at the time of the events giving rise to the Liljebergs' "circumvention claim," we believe the Supreme Court of Louisiana would conclude that Lifemark's contested practice of ordering and distributing certain legend drugs and kits containing legend drugs did not violate the Louisiana pharmacy laws. This conclusion is bolstered by the legislature's later enactment of section 37:1224(F) as "new law." At the same tine, we are persuaded that the Supreme Court of Louisiana would conclude that governing state regulations required the involvement of the hospital pharmacy in the storage of legend drugs and kits containing legend drugs.

Accordingly, without any basis in state or federal requirements, the district court erred as a matter of law in expanding the scope of the pharmacy agreement through Tenet's policy manual to provide for a requirement that Liljeberg Enterprises be involved in the purchasing, procurement, or distribution of the legend drugs or kits containing legend drugs at issue.[126] Indeed, the law between the parties–section 2.6(a) of the pharmacy agreement–provides to the contrary.

The district court thus erred in awarding $5 million in damages on the basis, in part, that Lifemark "circumvented" Liljeberg Enterprises's hospital pharmacy and thereby denied

---

[126] *See Nat'l Union*, 915 F.2d at 989 ("Under Louisiana law, a contract is the law between the parties, and is read for its plain meaning." (citation omitted)).

compensation to Liljeberg Enterprises. Lifemark did not violate federal or Louisiana law by purchasing certain bulk drugs, such as contrast media and surgery kits, directly from drug wholesalers and distributing them to ancillary departments of the hospital for administration by doctors and nurses, but the hospital's storage of these drugs and kits outside of the hospital pharmacy contravened governing state regulations.

## iii.

Lifemark argues that, notwithstanding its challenges to the district court's interpretations of sections 4.1(a) and 2.6(a) of the pharmacy agreement in favor of Liljeberg Enterprises's "circumvention claim," the $5 million award cannot stand because Liljeberg Enterprises failed to adequately prove damages awarded in reliance on a procedurally flawed audit of patient charts. Moreover, Lifemark argues that the $5 million award for Liljeberg Enterprises's "circumvention claim" is duplicative, in part, of the $700,000 award for lost profits on contrast media, which we address below, and the $57,085 award for insulin and nitroglycerin underpayments, which we affirm.

## a.

Lifemark argues that, rather than even attempting to prove actual, itemized damages, Liljeberg Enterprises performed an audit of a small percentage of patient charts from which it asked a mathematics professor to extrapolate a damage figure. The district court rejected the professor's figure, finding "that the [Liljeberg

Enterprises] methodology to price the calculation of damages pursuant to its chart audit to be inflated." However, despite Lifemark's assertion that the district court found the chart audit to be unreliable, the only flaw the district court found in the audit was its "charging the full price of the drug plus the fee for each administration of a drug when, in fact, a multiple administration of a drug would have carried no separate acquisition cost," while the district court also found that Lifemark's claim "that 40% of all of the patients receive no drugs is also ... without foundation." On the basis of these findings, the district court found that "the correct figure is somewhere between [Lifemark expert] Dr. Haworth's $3,000,000 and a significant discount off the [Liljeberg Enterprises] expert's figure," which was at least $12.8 million, and accordingly found "that $5,000,000 is the proper figure."

The district court was presented with conflicting testimony and evidence as to the validity of the chart audit and the accuracy of its methodology. On appeal, Lifemark argues that the district court should have credited the testimony of its experts over the testimony and evidence offered by Liljeberg Enterprises in support of the audit. On the record before us, the district court was entitled to weigh the conflicting testimony and credit Liljeberg Enterprises's chart audit as the basis for a reasonably accurate estimate of the amount of damages, with modifications, and, in so doing, the district court did not base its award on mere

87

speculation or conjecture.[127]  It is well-settled that the district court is only required to determine the extent of the damages as a matter of just and reasonable inference and that the result need only be approximate.  The basis for the district court's award, while it is decidedly not "a perfect measure of damages," nevertheless meets these criteria on the record before us.

b.

Additionally, according to Lifemark, the $5 million award overlaps with two more specific damage awards for non-payments for contrast media and underpayments for insulin and nitroglycerin.  This is because Liljeberg Enterprises's pharmacy director admitted that both these claims were a part of Liljeberg Enterprises's "circumvention claim."  Additionally, the district court's $5 million award was based on the chart audit; that Liljeberg Enterprises's expert accepted the chart in calculating damages for claimed underpayments or non-payments for contrast media, insulin, and nitroglycerin.  That is, Liljeberg Enterprises did not back the overlapping charges out of the audit.

It is unclear whether the district court's $5 million figure took account of non-payments for contrast media or underpayments for insulin and nitroglycerin.  However, because the district court

---

[127] *See Theriot v. United States*, 245 F.3d 388, 395 (5th Cir. 1998) (noting that, when the district court's finding is based on its decision to credit the testimony of one witness over that of another, that finding, if not internally inconsistent, can virtually never be clear error); *accord Justiss Oil Co., Inc. v. Kerr-McGee Ref. Corp.,* 75 F.3d 1057, 1067 (5th Cir. 1996).

made specific awards with separate stated reasons as to each of these claimed underpayments, we must conclude that they were not included in the $5 million award, in the absence of more compelling evidence from Lifemark of duplicative awards.

iv.

We conclude that the district court erred, in part, in awarding $5 million on Liljeberg Enterprises's "circumvention claim" on the basis of its interpretation of section 2.6(a) of the pharmacy agreement. We cannot on the record before us quantify how much of the $5 million award was for Liljeberg Enterprises's "circumvention claim" under section 2.6(a), which we reverse in part, as distinguished from its claim under section 4.1(a), which we affirm. We therefore vacate the district court's $5 million award to Liljeberg Enterprises and remand to the district court for a redetermination of damages for Liljeberg Enterprises's "circumvention claim."

B.

Lifemark also argues that, because contrast media was not separately identifiable on patients' bills, Liljeberg Enterprises is not entitled to the $700,000 award for lost profits on contrast media under section 2.6(a) of the pharmacy agreement. Lifemark argues that the district court erred in relying upon an exception in section 2.6(a), which excludes "patient identifiable charges in which the cost of the drug is ... included in a fee or a charge for that procedure," to justify a $700,000 award.

89

The district court found that Liljeberg Enterprises originally supplied contrast media to the hospital, which was included as a separate item on the bill of a patient, but that American Medical later decided to include contrast media in what it urges are unidentifiable costs in a single procedure. The district court found that American Medical began including the contrast media cost within a single procedure in order to avoid having to purchase this item from Liljeberg Enterprises. The contention is that the pharmacy agreement allowed American Medical to purchase items and legend drugs from other sources "where the cost for the drug is not identifiable from the cost of the procedure." However, the district court concluded that, from American Medical's master price list or "charge master," it can identify the cost of contrast media by comparing the listed costs for procedures with and without contrast media and so, "for purposes of the [pharmacy agreement], it is an identifiable cost."

Lifemark argues that American Medical stopped billing contrast media as a separate item to each patient and began including them in bills for radiology procedures. Lifemark argues that it negotiated a favorable contract with a new vendor, which allowed it to bill for contrast media in this fashion, a practice that saved patients up to $400 per procedure. The argument continues that, pursuant to section 2.6(a) of the pharmacy agreement, American Medical stopped paying Liljeberg Enterprises for contrast media because, under its new practice, these drugs were "patient

90

identifiable charges in which the cost of the drug is ... included in a fee or charge for that procedure."

Section 2.6(a) provides that Liljeberg Enterprises "shall not provide, nor be entitled to any compensation, for ... (a) all drugs and supplies utilized by the ancillary departments of the Hospital [including, but not limited to, radiology] in preparation for, during, or immediately following departmental patient related procedures," including "those patient identifiable charges in which the cost of the drug is ... included in a fee or charge for that procedure."

The operation of this provision does not turn, as the district court concluded, on whether the charge for the drug can be identified, *i.e.*, is "identifiable," for each patient, but rather on whether such an "identifiable" charge is included in the fee or charge for the departmental patient related procedure in which the drug is used. The district court made no finding that the charges for the cost of contract media were not included in the charges for radiation procedures, but simply concluded that American Medical contravened the terms and spirit of the pharmacy agreement.

Section 2.6(a) is clear, and American Medical operated well within its terms. The district court erred in its implicit conclusion that American Medical breached the pharmacy agreement in bad faith. We reverse the district court's award of $700,000 to Liljeberg Enterprises as lost profits for Lifemark's failure to

91

purchase contrast media through the date of trial from Liljeberg Enterprises as required under the pharmacy agreement.

C.

Lifemark argues that the district court erred in awarding Liljeberg Enterprises $2,023,571, which represents costs incurred in excess of limits set by their contract. The argument is that the award is based on an erroneous conclusion that Lifemark improperly limited reimbursement for acquired drugs to prices set forth in Lifemark's prime vendor contracts; that this finding is erroneous because the limit is found in section 2.4 of the pharmacy agreement. Section 2.4 provides:

> OPERATOR [Liljeberg Enterprises, Inc.] agrees to obtain from LIFEMARK Pharmacy all of Hospital's inpatient (including emergency room patients) requirements for pharmaceutical services, including, without limitation, drugs, medicines, and intravenous solutions, to the extent LIFEMARK Pharmacy can provide same. LIFEMARK Pharmacy shall supply these items at cost. Nothing in this Agreement shall prevent OPERATOR [Liljeberg Enterprises, Inc.] from acquiring those items from another supplier if i) the cost for those items is less than what LIFEMARK Pharmacy would charge and ii) the quality of those items is equal to or superior to those supplied by LIFEMARK Pharmacy.

The district court concluded that, under section 2.4, Liljeberg Enterprises agreed to obtain all hospital inpatient requirements from Lifemark Pharmacy, which was obligated to supply the items at cost; that, Liljeberg Enterprises could purchase such required items from a vendor other than Lifemark Pharmacy only if Lifemark Pharmacy could not supply an item or if the item was less expensive elsewhere and the quality was equal or superior to that

92

supplied by Lifemark Pharmacy. The district court also found, however, that "Lifemark Pharmacy" did not exist at any time after the hospital opened and that Liljeberg Enterprises never purchased any drugs from "Lifemark Pharmacy" but instead purchased drugs under buying contracts from Bergan Brunswig and from Spark Drug. Finally, the district court found that Liljeberg Enterprises was paying six percent less for drugs than if it would have under purchasing contracts between drug manufacturers and wholesalers and American Medical and later Tenet.

The district court found that, where Liljeberg Enterprises's actual acquisition costs for drugs which it did not obtain through Lifemark's prime vendor contracts was greater than the amount shown for those drugs on the prime vendor contracts, Lifemark had deducted the difference between the amounts from its payments to Liljeberg Enterprises under the pharmacy agreement. At trial, Lifemark's expert witness Dr. Albert Richard applied the same approach to argue that Liljeberg Enterprises had wrongfully billed in excess of $600,000 based on the difference between Liljeberg Enterprises's actual acquisition costs and the amounts shown on Lifemark's prime vendor contracts. The district court rejected Dr. Richards's argument and found that Lifemark's contract administrator had wrongfully deducted amounts from Liljeberg Enterprises's bills on the basis of this approach. The district court found that Lifemark's approach failed to compare the National

93

Drug Code ("NDC") number[128] in Lifemark's prime vendor contract to the NDC number of the drugs actually supplied by Liljeberg Enterprises. Instead, payments were based on the lowest price possible for the type of drug supplied without regard to differences in generic versus name-brand drugs and in strength, quantity, bioequivalency, and bioavailability.

Lifemark first argues that American Medical and later Tenet are the successors to "Lifemark Pharmacy" for purposes of the pharmacy agreement. According to Lifemark, because American Medical purchased Lifemark in 1984, before the pharmacy opened, pricing was established by a prime vendor contract negotiated by American Medical on behalf of all American Medical-owned hospitals. This provided sources in bulk with favorable pricing, and Tenet later followed the same protocol.

Lifemark also argues that it was entitled under section 2.4 to pay Liljeberg Enterprises only the price for generic drugs, otherwise equivalent with regard to strength, bioequivalency, and bioavailability. It points out that Liljeberg Enterprises could have purchased its drugs at the lower prices under the prime vendor contracts by becoming a member of Tenet's group purchasing organization or by purchasing generic or other drugs from outside vendors at the lower prices; that Liljeberg Enterprises instead

---

[128] The district court found that "[a] coding system, implemented by NDC whereby each drug is given a code number, allows the identification of the drug manufacturer, its strengths and its quantity and, thus, is a means of identifying the cost of the drug pursuant to purchasing contracts."

94

chose to purchase and bill Lifemark for the more expensive name-brand drugs, thereby expanding its profits under the cost-plus contract. Liljeberg Enterprises responds that nothing in the pharmacy agreement authorized American Medical or Tenet to pay Liljeberg Enterprises for generic drugs when Liljeberg Enterprises was dispensing physician-requested name-brand drugs and that Lifemark never told Liljeberg Enterprises to dispense only generics.

We conclude that the district court did not err in its interpretation of section 2.4. Like the parties, whose past practice under the pharmacy agreement includes Liljeberg Enterprises's purchasing drugs under Lifemark's prime vendor contracts negotiated by American Medical, we substitute American Medical/Tenet for "LIFEMARK Pharmacy," so that the comparison for purposes of the phrase "less than what LIFEMARK Pharmacy would charge" looks to Lifemark's prime vendor contracts. However, the provision that Liljeberg Enterprises could obtain drugs from other suppliers so long as "the cost for those items is less than what LIFEMARK Pharmacy would charge" does not in itself contemplate that, while American Medical/Tenet would charge one price for requested name-brand drugs under the prime vendor contracts, Lifemark can pay Liljeberg Enterprises only the cost of generic equivalents under the prime vendor contracts.

On appeal, Lifemark does not challenge the finding that Liljeberg Enterprises paid the same or less for name-brand drugs

95

than if it would have paid for the same *name-brand* drugs under Lifemark's prime vendor contracts, which Lifemark simply describes as providing "favorable bulk prices."[129]  Instead, Lifemark complains that Liljeberg Enterprises should have been purchasing only generic drugs or purchasing in bulk under its prime vendor contracts.  Nothing in section 2.4 entitles Lifemark to insist on such purchases by Liljeberg Enterprises in the absence of the availability from the prime vendor contracts of lower prices for the same drugs.  It is no answer that the pharmacy agreement requires the purchase of the lowest priced drugs and makes no exceptions for name-brand drugs where the term "items" in section 2.4 reasonably encompasses, in the context of the pharmacy agreement, both name-brand and generic drugs, depending on the order which Liljeberg Enterprises was called upon to fill.

We find no error in the district court's interpretation of section 2.4 or its findings supporting its award of $2,023,571 for Lifemark's wrongful disallowance of requested payment due to pricing differences.

D.

---

[129] Lifemark does challenge the specific finding that Liljeberg Enterprises is paying six percent less than Tenet's bulk prices on the basis that the supporting testimony for this finding referred only to the price Liljeberg Enterprises was paying at the time of trial.  However, Lifemark points to no evidence that would show clear error in the district court's broader finding that the prices for name-brand drugs under Lifemark's prime vendor contracts are not lower than the prices Liljeberg Enterprises was paying for the same name-brand drugs.

Lifemark argues that the district court misread the minimum fee increase provision of the pharmacy agreement, section 4.1(c). This led to its finding that Lifemark should have increased the minimum fee in 1995 and its award of $150,275.60.  Section 4.1(c) of the pharmacy agreement provides:

> LIFEMARK agrees that OPERATOR's [Liljeberg Enterprises, Inc.'s] minimum fee expressed in Exhibit B shall be increased annually by the lesser of (i) the percentage increase in the Department's revenue per patient day and (ii) the percentage increase in the Hospital Market Basket Index, as published by the American Hospital Association, or appropriate successor index (the "Index"); provided however, that in any year in which there is either no change or a percentage decrease pursuant to subsection (i) or (ii) above, the minimum fee shall not be changed and provided, further, that the calculations in any year pursuant to subsection (i) and (ii) above shall be adjusted for any decrease, if any, in the immediately preceding years.  The percentage calculated pursuant to subsection (i) above shall be a fraction, the numerator of which is the revenue per patient day for the year just ended and the denominator of which is the revenue per patient day for the prior year.  The percentage calculated pursuant to subsection (ii) above shall be a fraction, the numerator of which is the most recently published Index and the denominator of which is the last published Index immediately prior to the beginning of the most recently concluded 12-month period of this subsection Agreement.  The first adjustment shall be made as of the first day of the thirteenth (13th) month of the term of this Agreement and shall be based solely upon subsection (ii) above, and subsequent adjustments shall be made on each annual anniversary date thereafter.

The district court found that Liljeberg Enterprises receives 33% of its revenue from minimum fee items under the pharmacy agreement and that, for the period September 1, 1995 through May 31, 1997, Liljeberg Enterprises received $2,447,485.35 from minimum fee revenue; that this amount was paid by Lifemark based upon

97

Lifemark's mistaken belief that no increase in the minimum fee was due under the terms of the pharmacy agreement. The district court concluded that under the pharmacy agreement a 6.14% increase in the minimum fee should have been paid to Liljeberg Enterprises, an additional $150,275.60 for the period September 1, 1995 through May 31, 1997. These findings are based on the district court's conclusion that, under section 4.1(c), the term "immediately preceding years" requires, as Liljeberg Enterprises claims, that the minimum fee for any year is to be calculated based upon the immediate preceding year and not, as Lifemark claims, upon the highest percentage for any prior year.

Lifemark's only argument here is that reading the word "years" as singular and not plural led the district court to erroneously conclude that a minimum fee increase should be allowed when there is a net increase based upon a single year's growth on the heels of several years of losses. Lifemark contends that this interpretation flies in the face of common sense as well as the language of the pharmacy agreement, which calls for the netting of decreases in previous years against any increases in the current year's revenue. Lifemark asserts that it is undisputed that pharmacy revenue per patient day declined during the years 1992-1994 and that, although Liljeberg Enterprises increased its per-patient revenue in 1995, a cumulative decrease remained, such that the minimum fee increase provision was not triggered.

We conclude that the district court erred in its interpretation of section 4.1(c).[130] The pharmacy agreement nowhere explicitly mentions "netting" or aggregating prior years' percentage decreases or changes. Yet every provision of the pharmacy agreement must be interpreted in light of the contract's other provisions, to give each provision the meaning suggested by the contract as a whole and to avoid neutralizing, ignoring, or treating as mere surplusage any provision.

Section 4.1(c) calls for an increase in the minimum fee based on the lesser of the percentage increase in the pharmacy's revenue per patient day and the percentage increase in the Hospital Market Basket Index so long as (1) there was a percentage increase in both the pharmacy's revenue per patient day and the Hospital Market Basket Index, *i.e.*, neither of these indices experienced either "no change or a percentage decrease," (2) "provided, further, that the calculations in any year pursuant to subsection (i) and (ii) above shall be adjusted for any decrease, if any, in the immediately preceding years." The district court apparently read this provision to provide for an increase in minimum fees by the lesser of the percentage increase in the pharmacy's revenue per patient

---

[130] We are not persuaded by the Liljebergs' argument that this issue is controlled by the Louisiana state court decision's preclusive holdings. *See Liljeberg Enters.*, 620 So.2d at 1340 (holding only that the trial court erred in determining that the starting date for the escalation of the minimum fees was March 1, 1984, whereas "any adjustments in the minimum fees should have begun thirteen months from August 25, 1985, the date St. Jude's Hospital began operations").

day and the percentage increase in the Hospital Market Basket Index that year, so long as there was no percentage decrease in the "immediately preceding year." Lifemark would read the provision to prohibit a minimum fee increase until there is no net percentage decrease when the current year's percentage increase is added to the percentage decreases in some unspecified number of preceding years.

The district court's interpretation gives no effect to the phrase "the calculations in any year pursuant to subsection (i) and (ii) above *shall be adjusted for*" and, without any explanation or apparent finding of ambiguity, reads "immediately preceding years" as singular and not plural. Looking to the meaning of this phrase in section 4.1(c) suggested by the contract as a whole, we note that the "calculations" at issue are important for determining whether there is an increase, a decrease, or no change as a matter of percentages. The most reasonable understanding of "adjusting" the calculations "for any decrease, if any, in the immediately preceding years" is to offset any percentage increase in the current year by the net "decrease, if any, in the immediately preceding years." The natural sense of "immediately preceding years" conveys the last two or three years, in order to give effect to both the phrases "immediately preceding" and "years."

Accordingly, we conclude that the district court erred in its interpretation of section 4.1(c). As such, we reverse the district

100

court's award of $150,275.60 to Liljeberg Enterprises for Lifemark's failure to implement minimum fee increases due to Liljeberg Enterprises under the pharmacy agreement through the date of trial.

## E.

Lifemark argues that the district court erred in awarding Liljeberg Enterprises $281,906.32 based upon its finding that the HPI reports[131] failed to reflect drug prices and frequencies submitted in reports generated by Liljeberg Enterprises. Lifemark asserts that this finding is clearly erroneous because it is predicated on a fundamental misunderstanding of the parties' record-keeping and billing procedures and because it overlooks Liljeberg Enterprises's failure to provide documentation to support the accuracy of the prices and quantities it submitted.

The district court found that Lifemark improperly entered cost data into its computer, "deleted administered doses dispensed by Liljeberg Enterprises without any known reason from [Liljeberg Enterprises's] daily and monthly disks," and generated inaccurate HPI reports which incorrectly reflected the drug prices and frequencies dispensed by Liljeberg Enterprises, and that the HPI reports also failed to take into account floor stock. The district court further found that there was no evidence that the drugs at

---

[131]  HPI rates represented the prices at which Liljeberg Enterprises billed Lifemark for pharmaceuticals, and HPI rates were located on the monthly "hospital pharmacy billing" report, or "HPI report."

issue in Liljeberg Enterprises's claim for underpayments due to Lifemark's incorrect pricing and quantity differences between January 1989 and May 31, 1997 were not provided by Liljeberg Enterprises and that the evidence in the record revealed that floor stock items were not accounted for by Lifemark.

Reviewing these factual findings for clear error only, we find that this damage award is based on a plausible account of the evidence considered against the entirety of the record. Lifemark points out that Liljeberg Enterprises's own pharmacy director clearly testified that the daily disks provided by the Liljeberg Enterprises pharmacy to Lifemark contained only the quantity that the pharmacy dispensed, not the doses administered by the hospital's doctors and nurses, such that it was not possible that Lifemark's computers deleted *administered* doses dispensed by Liljeberg Enterprises from Liljeberg Enterprises's daily disks. At the same time, Lifemark does not deny that the HPI reports often indicated that the actual cost of acquisition of a drug to be zero and did not always account for so-called floor stock. The district court heard conflicting testimony as to whether Lifemark adequately paid Liljeberg Enterprises for this floor stock and the zero entries on the HPI reports, and it was entitled to credit Liljeberg Enterprises's account of the evidence. Lifemark's citation to isolated testimony favorable to its position on each of these fact findings does not show clear error.

102

We affirm the district court's award of $281,906.32 to Liljeberg Enterprises for pricing and quantity differences.

## F.

Lifemark argues that district court miscalculated the actual acquisition costs payable under the judgment of the Louisiana state court of appeal in a prior case between Liljeberg Enterprises and Lifemark involving the pharmacy agreement. According to Lifemark, Liljeberg Enterprises and Lifemark stipulated that they would "split the difference" between their experts' numbers, which was $3,575,748 by Lifemark's expert and $4,062,396 by Liljeberg Enterprises's expert. Accordingly, Lifemark contends that the district court should have awarded $3,819,072, not $4,062,396, which was the number given by Liljeberg Enterprises's expert.

Lifemark acknowledges that it owes Liljeberg Enterprises for actual acquisition cost for drugs for the period August 1989 through June 1993 pursuant to the preclusive state court judgment,[132] but argues that the district court erred in finding that "[t]he parties have stipulated that the actual acquisition cost billed by [Liljeberg Enterprises] for the period is $4,062,396.00." Liljeberg Enterprises suggests that the record indicates that Lifemark's and Liljeberg Enterprises's experts originally did split at $4,062,396, but that Lifemark's expert later tried to lower that figure.

---

[132] *See Liljeberg Enters. Inc. v. Lifemark Hosps. of La., Inc.*, 620 So.2d 1331 (La. App. 4 Cir.), *writs denied*, 621 So.2d 818 (La. 1993).

The record reflects that the parties stipulated at trial that the amount of this award should be fixed at the mid-point between the sum determined by Liljeberg Enterprises's expert and the sum determined by Lifemark's expert. Liljeberg Enterprises's expert's number was undisputedly $4,062,396. The number provided by Dr. Richard, Lifemark's damages expert, began at $3,990,953, and at trial he testified that the average of these figures would be $4,026,675. However, he then discussed several adjustments off this number and presented a figure of $3,575,748, which Lifemark now urges on appeal to provide an average of $3,819,072.

Based on the parties' stipulation, we conclude that the district court clearly erred in not splitting the difference between Dr. Richard's original figure of $3,990,953 and Liljeberg Enterprises's figure of $4,062,396. We must reduce this award to $4,026,675.

G.

Lifemark argues that the district court erred by not awarding Lifemark $2,585,138 in reimbursement of Liljeberg Enterprises's overcharges based on Liljeberg Enterprises's submission each month of a lump sum bill that was inexplicably higher than and inconsistent with the daily record of patient billing that Liljeberg Enterprises provided to Lifemark. According to Lifemark, the evidence at trial showed that this claim included (1) $184,000 overbilled to Lifemark based upon claimed frequencies of drugs dispensed; (2) $1,497,078 for thousands of unexplained $3.05

104

"admixture fees," overcharges relating to I.V.s, for which Lifemark should have been awarded $880,678, after a credit of $616,400 for the amount awarded to Lifemark for overcharges relating to I.V. handling fees for piggybacks;[133] (3) $885,644 which Liljeberg Enterprises overcharged Lifemark for heparin flush kits, which the district court found but refused to award on the basis that Lifemark passed the overcharges onto patients and suffered no loss; and (4) $634,816 in overcharges resulting from Liljeberg Enterprises's submission of incorrect pricing information from September 1, 1989 through April 30, 1993 on Liljeberg Enterprises's bills based upon HPI reports using pricing information from Liljeberg Enterprises's add/change/delete forms.

i.

First, Lifemark argues that it presented uncontroverted evidence that Liljeberg Enterprises, in adjusting the bills to Lifemark to reflect the frequencies of drugs dispensed, only adjusted the bills when the numbers favored Liljeberg Enterprises and failed to adjust the bills when the numbers favored Lifemark, which resulted in an overbilling which Dr. Richard estimated as at least $184,000. Liljeberg Enterprises points to no evidence to the contrary, but argues that the $184,000 Lifemark claims is based on

---

[133] The district court found that "[a] 'handling fee' is a charge imposed on a large volume patental ('LVP') that is handled by a pharmacist" and that "[a]n 'admixture' is the result of additives being placed in an intravenous solution," where "[e]ach additive to a solution is performed as a separate procedure."

105

frequencies of drugs which the hospital alone handled and was responsible for and which, assuming Lifemark dispensed these drugs in violation of the pharmacy agreement, more likely than not would increase, not decrease, Liljeberg Enterprises's damages if an accounting were made of the compensation owed for these drugs under the pharmacy agreement.

The district court made no relevant findings as to this claim and did not explicitly deny it, and, as Lifemark aptly observes, Liljeberg Enterprises's response is a non-answer. We conclude that the failure to award this sum is clearly erroneous. The record evidence submitted by Lifemark leaves us with the firm and definite conviction that the only plausible account of the evidence considered against the entirety of the record is that Liljeberg Enterprises systematically overcharged Lifemark by failing to correct drug frequency reports when the preliminary frequency shown on Lifemark's HPI report exceeded the frequency shown on Liljeberg Enterprises's pharmacy charge report.[134]

The evidence is that Dr. Richard testified that $184,000 is a reasonable estimate of the amount of the aggregate overcharges. We are given no conflicting evidence and modify the judgment to award Lifemark $184,000 in damages on this claim.

ii.

---

[134] Liljeberg Enterprises also implies that the denial of these damages was appropriate because Lifemark readily billed its patients on the basis of the numbers in the HPI reports. This pass-through argument, addressed more fully below, is wholly unpersuasive.

106

Second, Lifemark contends that, when Liljeberg Enterprises's bills were scrutinized at trial, Liljeberg Enterprises was unable to explain thousands of $3.05 "admixture fees" relating to I.V.s and argues that the district court clearly erred in failing to award damages based on Dr. Richard's calculation of reimbursement of the total overcharge for these unexplained fees, $1,497,078. Lifemark contends that, notwithstanding the unexplained "admixture" charges and the discrepancies in the pharmacy's reporting of the charges, Lifemark was billed these charges thousands of times each month for several years and paid them. The district court made no relevant findings as to this claim and did not explicitly deny it.

On the record before us, we cannot conclude that the district court clearly erred in failing to award damages to Lifemark for these overcharges. The district court awarded Lifemark $616,400 for Liljeberg Enterprises's overcharges on I.V. piggyback fees under the pharmacy agreement, which Liljeberg Enterprises has not appealed, and the number offered by Dr. Richard was $1,497,078 in gross overcharges for I.V. handling and admixture fees. Lifemark seeks an award of $880,678 after applying a credit of $616,400 for the amount awarded for overcharges relating to I.V. handling fees for piggybacks.

The record before us, however, does not allow us to arrive at a reasonably accurate estimate of the amount of damages for any overcharges for the I.V. "admixture" fees disaggregated from Dr. Richard's estimate of the gross overcharges for I.V. handling and

107

admixture fees. Accordingly, we affirm the district court's decision to deny Lifemark an award on this claim.

### iii.

Third, Lifemark argues that the district court erred by finding that "[Liljeberg Enterprises] has in fact overcharged [Lifemark] for [Heparin flush kits]" but then refusing to reimburse Lifemark for the $885,644 overcharge due to its conclusion that Lifemark passed the overcharge onto patients and suffered no loss. Lifemark contends that this latter finding was based upon a misreading of the testimony of Steven Faucheaux, Lifemark's administrative pharmacist. According to Lifemark, the district court found that Faucheaux testified that Lifemark billed its patients based upon Liljeberg Enterprises's "overcharge price and multiplied that cost times three," when, in fact, Faucheaux explicitly denied basing patient charges on Liljeberg Enterprises's "overcharge prices" and instead explained that "patient rates are from a totally separate mechanism" and that Lifemark "uses the actual wholesale price of the drug" to bill patients. Moreover, Lifemark argues that, even if the overcharges were passed on, Lifemark was entitled to realize the benefit of its bargain by paying the lower costs to Liljeberg Enterprises, citing Louisiana Civil Code article 1995.[135]

---

[135] LA. CIV. CODE art. 1995 ("Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived.").

108

The district court found that Lifemark, American Medical, and Tenet bill the hospital's patients a set markup from the price charged by Liljeberg Enterprises for each drug, including a triple markup for heparin flush kits. The court then concluded that, although Liljeberg Enterprises in fact overcharged Lifemark for heparin flush kits, Liljeberg Enterprises is not liable for damages because Lifemark suffered no loss when it charged its patients three times the overcharge price for the loss and so actually profited from the overcharge by passing it on to patients.

Regardless of whether Lifemark tripled the charges from Liljeberg Enterprises in billing its patients, we concluded that the district court's "pass-through" reasoning is without merit. Even if Lifemark recouped the overcharge payments many times over, Liljeberg Enterprises remains liable for the amount it overcharged Lifemark in the first instance in breach of the pharmacy agreement.[136] Neither the district court nor Liljeberg Enterprises has presented any authority to the contrary. Under Louisiana law, Lifemark suffered a loss as a matter of law by overpaying Liljeberg Enterprises based on Liljeberg Enterprises's systematic overcharges for heparin flush kits.

Based on the evidence presented by Lifemark, including the expert report of Dr. Richard, the district court clearly erred as

---

[136] *Cf. S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 534-35 (1918); *Hughes Communications Galaxy, Inc. v. United States*, 38 Fed. Cl. 578, 580-82 (1997).

a matter of law in failing to award Lifemark $885,644 for the heparin flush kit overcharges.  We modify the judgment to provide the award to Lifemark of $885,644 in damages on this claim.

iv.

Fourth and finally, Lifemark argues that the district court erred by failing to award Lifemark $634,816 based on overcharges resulting from Liljeberg Enterprises's submission of incorrect pricing information from September 1, 1989 through April 30, 1993. Lifemark contends that, although during that time period, Liljeberg Enterprises's bills were based solely upon HPI reports, which were generated by the hospital's computers, the pricing information, the "HPI rate," came directly from Liljeberg Enterprises's add/change/delete forms, on which, in several instances, Liljeberg Enterprises submitted the wrong HPI rate.

We cannot find clear error in the rejection of this claim. The evidence presented by Lifemark does not leave us with a definite and firm conviction that the district court was mistaken in denying the claim.  The claim was based on Dr. Richard's extrapolation of a 60-item sample that Lifemark wrongfully paid $634,816 as a result of Liljeberg Enterprises's errors in using the HPI rate.  Unlike the evidence regarding the systematic frequency billing discrepancies which overwhelmingly ran in Liljeberg Enterprises's favor, the evidence here simply shows that some HPI rates drawn from Liljeberg Enterprises's add/change/delete forms were incorrect and Lifemark failed to notice and correct the error

110

based on the information provided by Liljeberg Enterprises in the first instance.

We therefore affirm the district court's denial of an award to Lifemark on this claim.

## VIII. Judgment against Tenet

Lifemark argues that, because Tenet was not sued by Liljeberg Enterprises or St. Jude, it was error for the district court to enter judgment against it. The district court made no finding of jurisdiction over Tenet nor any ruling formally adding Tenet as a party to this consolidated case, and a review of the district court's docket sheet confirms that, to this day, Tenet is not a party in this case and has never been joined as a defendant or served with process.

"It is elementary that one is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process."[137] The Liljebergs' reliance on case law regarding successor liability and collateral estoppel is misplaced. The issue is jurisdiction over a non-party to the actions, not liability for a party already properly joined and served. We conclude that the district court erred in entering judgment against

---

[137] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969); *accord Waffenschmidt v. MacKay,* 763 F.2d 711, 718 (5th Cir. 1985); *E.B. Elliott Adver. Co. v. Metro. Dade County*, 425 F.2d 1141, 1148 (5th Cir. 1970).

Tenet, a non-party in this case, and we must vacate the judgment in its entirety as against Tenet.

## IX. Attorneys' Fees

On their cross-appeal, the Liljebergs argue that Liljeberg Enterprises and St. Jude are entitled to attorneys' fees under the parties' lease agreement and under Civil Code articles 1997 and 1958. On the record before us and based on our rulings on this appeal, Liljeberg Enterprises and St. Jude have no basis for a claim for attorneys' fees.

First, we have reversed the district court's judgment overturning the judicial sale and reinstating, *inter alia*, the lease between St. Jude and Lifemark. Accordingly, even assuming the claim has not been waived, as Lifemark claims, there is no basis to award St. Jude fees under section 17.1 of the lease.

Second, Louisiana Civil Code article 1958 provides that "[t]he party against whom rescission is granted because of fraud is liable for damages and attorney fees." Again, however, even assuming this provision would apply to this case based on the district court's findings of fact and conclusions of law and that this claim has not been waived, we have reversed the district court's judgment which overturned the judicial sale and ordered rescission of the hospital.

Finally, Louisiana Civil Code article 1997 provides that "[a]n obligor in bad faith is liable for all the damages, foreseeable or

112

not, that are a direct consequence of his failure to perform."
There is conflicting authority as to whether this provision
authorizes the award of attorneys' fees for a bad faith breach of
contract.[138]  However, we need not decide this unsettled issue
because the Liljebergs failed to raise article 1997 as a basis for
attorneys' fees in the district court and have therefore waived any
claim to attorneys' fees.[139]  We are not persuaded that our refusal
to consider this claim for the first time on appeal would work a
miscarriage of justice.

## X.

To summarize our holdings,(i) we reverse the district court's
judgment in Cause No. 94-3993 overturning the judicial sale of the
hospital and reinstating various commercial instruments relating to
the financing and lease of the hospital and remand for calculation
of the amount of, and entry of judgment on, the past due deficiency
owed to Lifemark Hospitals, Inc. on the renewal promissory note and
interest due thereunder; (ii) we reverse the judgment in Cause No.
93-1794 granting Liljeberg Enterprises's motion to assume the
pharmacy contract; (iii) in Cause No. 93-4249, we affirm the
district court's damage awards to Liljeberg Enterprises of

---

[138]  *See Newport Ltd. v. Sears, Roebuck & Co.*, No. Civ. A. 86-2319, 1995 WL
688799, at *4-*8 (E.D. La. Nov. 21, 1995).

[139]  *See N. Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 916
(5th Cir. 1996) (holding that the Court of Appeals will not consider an issue
that a party fails to raise in the district court absent extraordinary
circumstances, which exist only when the issue is a pure question of law and a
miscarriage of justice would result from the failure to consider it).

$2,023,571 for Lifemark's wrongful disallowance of requested payment due to pricing differences and $281,906.32 for pricing and quantity differences; (iv) we reverse the district court's award to Liljeberg Enterprises of $700,000 as lost profits for Lifemark's failure to purchase contrast media from Liljeberg Enterprises and $150,275.60 for Lifemark's failure to implement minimum fee increases due to Liljeberg Enterprises under the pharmacy agreement through the date of trial; (v) we modify the district court's award of $4,062,396 for Lifemark's failure to reimburse Liljeberg Enterprises its actual acquisition costs for the period August 31, 1989 through June 1, 1993 to $4,026,675; (vi) we vacate the district court's $5 million award to Liljeberg Enterprises and remand to the district court for a redetermination of damages for Liljeberg Enterprises's "circumvention claim"; (vii) we conclude that the district court clearly erred in failing to award Lifemark $184,000 in overbillings by Liljeberg Enterprises based upon claimed frequencies of drugs dispensed and $885,644 for the heparin flush kit overcharges, and we award Lifemark damages in these amounts; (viii) we reverse the district court's judgment against Tenet, a non-party to this case; and (ix) we conclude that Lifemark's other points of error on appeal and the Liljebergs' points of error on their cross-appeal are without merit.[140]

---

[140] As a final housekeeping matter, the Liljebergs' motion to strike Lifemark's reply brief's cross-index, which has been carried with the case, is meritless and is denied. The inclusion of the index is not prohibited by any rule, and it did not cause the reply brief to exceed the word count mandated by

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.

---

Federal Rule of Appellate Procedure 32.